**UNITED STATES of America ex rel. Ramesh GUDUR, Plaintiff–Relator,**

v.

**DELOITTE CONSULTING LLP, Defendant.**

**Civil Action No. H–00–1169.**

United States District Court, S.D. Texas, Houston Division.

March 15, 2007.

See, also, 2007 WL 788157.

## MEMORANDUM OPINION AND ORDER

SIM LAKE, District Judge.

Pending in this *qui tam* action brought under the False Claims Act (FCA), 31 U.S.C. § 3729 *et seq.*,[1] are the Motion for

1. ''The phrase *'qui tam'* is a shortened version     of the Latin phrase, *'qui tam pro domino rege,*

Summary Judgment (Docket Entry No. 678) filed by defendant Deloitte Consulting LLP (Deloitte) and two motions for partial summary judgment filed by Plaintiff–Relator, Ramesh Gudur: Relator's Motion for Partial Summary Judgment (*Time Survey v. Time Study*) (Docket Entry No. 679), and Relator's Motion for Partial Summary Judgment (Indirect Cost) (Docket Entry No. 680). Also pending is Deloitte's Motion to Strike the Statement of Interest of the United States Regarding Deloitte's Motion for Summary Judgment (Docket Entry No. 789). For the reasons set forth below, Deloitte's motion for summary judgment and motion to strike will be granted, and Relator's motions for partial summary judgment will be denied.

## I. *Background*

### A. Procedural Background

The procedural history of this case can be found in the court's prior orders. (Docket Entry Nos. 202, 237, 283, 344, 395, 501) Only Relator's claims against Deloitte Consulting, LLP ("Deloitte") remain. The claims against Deloitte are based on allegations that Deloitte caused false Medicaid claims to be submitted to the United States Government, and that Deloitte conspired with certain Texas school districts to inflate Medicaid reimbursement rates in violation of the FCA. See Relator's Third Amended Complaint (Docket Entry No. 397) and the court's August 31, 2004, Memorandum and Order (Docket Entry No. 501).

### B. Factual Background

1. *Undisputed Facts*

(a) General Facts

By federal mandate Texas school districts must provide a free and appropriate

public education to all children. This includes the provision of free health-related services needed to help special education students achieve the goals set forth in their Individual Education Plans. For many years the obligation to provide free health related services was an unfunded mandate. However, in January of 1989 passage of the Medicare Catastrophic Coverage Act of 1988, Public Law 100–360 (1988) required the federal government to make Medicaid reimbursement available to qualified providers of health-related services for special education children in the school setting. This law became effective in January of 1989. (See Staff Performance Report to 74th Legislature, Docket Entry No. 678–7 at pp. 43–44.)

In October of 1990 the State of Texas submitted for federal approval the first proposed State Plan Amendment (SPA) to include coverage for the School Health and Related Services (SHARS) program. (See Staff Performance Report to 74th Legislature, Docket Entry No. 678–7 at pp. 43–44.)

In September of 1992 the SPA creating the SHARS program received federal approval. The SHARS program allowed school districts to claim Medicaid reimbursement for nine health-related services: occupational, physical, and speech therapy; medical, school health, and psychological services; assessments; audiology; and counseling. (See Staff Performance Report to 74th Legislature, Docket Entry No. 678–7 at pp. 43–44.) In October of 1992 the National Heritage Insurance Company (NHIC), the government's designated claims facility, began accepting provider applications from local school districts and special education cooperatives,

---

*quam pro se ipso in hac parte sequitar,'* meaning 'who prosecutes this suit as well for the king, as for himself.' " *United States ex rel. Garibaldi v. Orleans Parish School Board,* 21

F.Supp.2d 607, 609 (E.D.La.1998). Thus, a *qui tam* action is brought by a private individual on the government's behalf.

and in November of 1992 NHIC began accepting claims for reimbursement under the SHARS program. The SPA provided that SHARS reimbursement rates would be based on cost data gathered in a 1999 study by the Texas Interagency Council on Early Childhood Development until a new cost study could be completed. Provided that adequate documentation was available, school districts could claim reimbursement for services back to December of 1991. (See Staff Performance Report to 74th Legislature, Docket Entry No. 678–7 at pp. 43–44.)

In June and July of 1993 the Medicaid operating agency gathered cost data for the purpose of establishing SHARS-specific reimbursement rates. In September of 1993 House Bill 7 shifted responsibility for administration of the SHARS program from the Texas Department of Human Services (DHS) to the Texas Department of Health (TDH). However, DHS maintained responsibility for determining Medicaid eligibility. (See Staff Performance Report to 74th Legislature, Docket Entry No. 678–7 at p. 44.) Before the cost data was compiled and analyzed, TDH determined that the data was inadequate and obsolete.

In April of 1994 the State of Texas received federal approval for a second SPA to include special transportation as a (tenth) reimbursable service. In April of 1994 Deloitte began working with the Texas Education Agency (TEA) to establish new SHARS reimbursement rates based upon: (1) cost data gathered in 1993; (2) time data gathered by Deloitte in 1994; and (3) financial information relating to special education expenditures for all school districts in the state maintained by the TEA. This effort resulted in rates that ranged between 13 percent and 164 percent (an average of 98%) higher than the previously used rates. (See Staff Performance Report to 74th Legislature,

Docket Entry No. 678–7 at p. 48.) In August of 1994 Deloitte proposed new interim rates for nine of the ten SHARS services. In November of 1994 TDH approved and adopted four of the nine rates proposed by Deloitte (i.e., rates for assessment, psychological services, school health services, and speech therapy). TDH rejected the remaining five rates proposed by Deloitte (i.e., rates for audiology, counseling, medical services, occupational therapy, and physical therapy). (See Staff Performance Report to 74th Legislature, Docket Entry No. 678–7 at pp. 45 & n. 2, and 48–49.) In an October 20, 1994, letter to the TEA, Joseph Branton of the TDH explained that

> [t]he department has chosen to use the rates proposed by Deloitte and Touche for school health services and speech therapy services as the rate increases appear reasonable and these services are the most frequently billed. The department has also chosen to use the rates proposed by Deloitte and Touche for assessment and psychological services in light of the resources required to perform the services.
>
> While we agree that the remaining SHARS rates need to be revised, we are concerned about the insufficient data available to Deloitte and Touche to establish the revised rates. We are also concerned about the comparability of these rates to payment rates of other providers of these services and about the potential liability of the state and the department in the event of a HCFA [Health Care Financing Administration] audit. Therefore, the remaining SHARS rates are only being updated for inflation. We do plan, however, to conduct our own cost study of the SHARS rates in the near future and will make future adjustments as necessary to reflect the costs of these services to the school districts.

The revised SHARS rates will be presented to the Board of Health at its November meeting for approval to implement December 1, 1994.

(Docket Entry No. 678–8 at p. 45) The following year TDH promulgated new SHARS rates for the remaining five services that it adjusted for inflation; the new rates for these five services took effect in September of 1995. (Branton Memorandum of July 10, 1995, Docket Entry No. 678–8 at p. 48)

### (b) Specific Facts

### (1) Initial SHARS Rates

The SHARS reimbursement rates used through November of 1994 were based on cost data from approximately 14 school districts that had participated in a 1989 cost study conducted by the Texas Interagency Council on Early Childhood Intervention. The Medicaid SPA provided that these rates would be used by SHARS providers temporarily until another cost study could be completed. (See Staff Performance Report to 74th Legislature, Docket Entry No. 678–7 at p. 48.)

### (2) Relator's Effort to Develop SHARS–Specific Rates

In March of 1991 TDH hired Relator as a Program Specialist for the SHARS program to, *inter alia,* draft service definitions, prepare an SPA for federal approval, and calculate prospective SHARS reimbursement rates. Although TDH supervised Relator, TEA paid his salary pursuant to a Memorandum of Understanding between the two agencies. (See Gudur Deposition, Docket Entry No. 678–5 at pp. 5–6, and 12–13; Branton Deposition, Docket Entry No. 678–3 at p. 18.) Because Relator had no prior rate-setting experience, he was to be assisted by two experienced TDH rate-setters, Nancy Kimble and Jeff Phelps. (Gudur Deposition, Docket Entry No. 678–5 at p. 5) Realtor also worked with TEA officials Janet Spurgin and Ken Crow to formulate a cost report and a time study for the purpose of gathering data needed to establish SHARS rates. (Gudur Deposition, Docket Entry No. 678–5 at pp. 6–7; Spurgin Affidavit, Docket Entry No. 678–7 at pp. 38–39)

Relator, assisted by other state officials, developed a cost report designed to capture the actual direct costs incurred by school districts delivering SHARS. (Gudur Deposition, Docket Entry No. 678–5 at p. 7) TEA selected a random sample of 33 Texas school districts to which Relator mailed cost reports during the summer of 1993. (Gudur Deposition, Docket Entry No. 678–5 at pp. 23 and 25) The cost reports asked the school districts to submit data from the September 1991 to August 1992 school year. (Gudur Deposition, Docket Entry No. 678–5 at p. 9) Since this was the first time that Texas school districts had been asked to prepare cost reports, Relator provided training to the participating school districts. (Gudur Deposition, Docket Entry No. 678–5 at pp. 19–20) During the summer of 1993 the school districts completed the cost reports and returned them to TDH. (Gudur Deposition, Docket Entry No. 678–5 at p. 25) Relator then developed "rates based on that data, which were not accepted. So that's when Deloitte & Touche came in— along with TEA—and said that they were going to come up with rates." (Gudur Deposition, Docket Entry No. 678–5 at p. 25)

### (3) Deloitte's Effort to Develop SHARS–Specific Rates

On March 21, 1994, David Bankard of Deloitte sent a letter to Joseph Branton of TDH offering—at no charge to TDH— technical assistance in setting SHARS rates. (Bankard Letter, Docket Entry No. 678–8 at pp. 2–5) On April 7, 1994, TDH

accepted Deloitte's offer of technical assistance and asked Deloitte to

[p]lease note the following conditions as you proceed with your proposed work:

1) Please involve Mr. Ray Gudur, a member of our staff, in all aspects of this project.

2) Please provide copies of any and all documentation used in arriving at your results. Please note that rate development must comply with all Medicaid requirements.

3) The Texas Department of Health reserves the right to make a final decision regarding the implementation of the rates suggested.

(Branton letter, Docket Entry No. 678–8 at p. 7) (See also Gudur Deposition, Docket Entry No. 678–5 at p. 17.)

Deloitte assigned Paul David Christenson, an experienced rate-setter, to work with TDH and TEA in developing SHARS rate recommendations. (Christenson Deposition, Docket Entry No. 678–4 at p. 6; Phelps Deposition, Docket Entry No. 678–7 at pp. 17–18; Bankard Deposition, Docket Entry No. 678–3 at p. 9) Christenson performed the following tasks:

· Gathered the previously completed cost-study reports from Mr. Gudur;

· Gathered indirect cost data from TEA's state-wide database (PEIMS);

· With assistance from TEA, developed a time survey with accompanying instructions;

· With assistance from TEA, gathered time-survey data from participating school practitioners;

· With assistance from TEA, analyzed the cost-study data from the school districts, the indirect cost data from PEIMS, and the time survey responses, and compiled the supporting data into the Rate Documentation Package,

which contained recommended SHARS reimbursement rates for nine services (assessment, audiology, counseling, medical services, school health services, occupational therapy, physical therapy, psychological services, and speech therapy);

· Presented the Rate Documentation Package to Mr. Gudur in July 1994, and responded to his questions; and,

· On August 15, 1994, presented the Rate Documentation Package to various TDH employees and answered their questions regarding it.

(Deloitte's Brief in Support of Motion for Summary Judgment, Docket Entry 678–2 at pp. 17–18) [2]

On July 19, 1994, after Relator received and reviewed Deloitte's rate recommendations, set forth in a 772–page document titled, "Texas Department of Health, School Health and Related Services, Medicaid Rate Documentation Package, Fiscal Year Ended 8/31/94" ("Rate Documentation Package"), Relator met with Spurgin and Christenson to discuss his concerns about Deloitte's SHARS rate recommendations, and later that day Christenson responded to Relator's concerns in writing. (Christenson Letter, Docket Entry No. 678–8 at pp. 9–19) On August 15, 1994, TDH's rate-setting staff met with Deloitte to discuss Deloitte's work and the recommendations set forth in Deloitte's Rate Documentation Package. (See August 15, 1994, Presentation of Medicaid Rate Documentation Methodology to TDH, Docket Entry No. 678–8 at pp. 31–43; Branton Deposition, Docket Entry No. 678–3 at p. 26; Phelps Deposition, Docket Entry No. 678–7 at p. 10.) Kimble and Phelps, TDH's experienced Medicaid rate-setters, independently reviewed Deloitte's Rate Documentation Package and reported

---

**2.** Relator has not disputed Deloitte's description of the tasks performed by Christenson.

their findings to TDH officials in writing. (Phelps Memorandum of August 23, 1994, Docket Entry No. 678–8 at pp. 21–22; Kimble Memorandum of August 23, 1994, Docket Entry No. 678–8 at pp. 24–25) A series of meetings ensued at which TDH, without additional input from Deloitte, discussed the Rate Documentation Package, considered various alternative approaches, and after subjecting the Rate Documentation Package to considerable scrutiny, concluded that the methodology and rates Deloitte proposed were consistent with the SPA. (Branton Deposition, Docket Entry No. 678–3 at p. 27; Phelps Deposition, Docket Entry No. 678–7 at p. 13)

### 2. *Disputed Facts*

At issue in this action is Deloitte's effort to assist TDH in developing SHARS-specific reimbursement rates. Relator alleges that Deloitte (1) caused Texas school districts to submit false claims for SHARS reimbursements by using a fraudulent rate-setting methodology developed with TDH in 1994, and (2) conspired with Texas school districts—none of which remain parties to this action—to artificially inflate the SHARS reimbursement rates by falsifying cost-report and/or time-survey data.

### II. *Deloitte's Motion to Strike Statement of Interest*

■ On November 17, 2006, the United States filed a document titled, "Statement of Interest of the United States Regarding Defendant Deloitte Consulting LLP's Motion for Summary Judgment." (Docket Entry No. 783) Asserting that the United States is the "real party in interest in this *qui tam* action" and "because the FCA plays a central role in the Government's ongoing efforts to combat fraud, the United States has a keen interest in the proper interpretation of the FCA," the United States "submits this Statement of Interest to provide assistance to the Court in interpreting and applying the FCA." (Docket Entry No. 783–1 at pp. 6–7) The Statement of Interest contains the United States' responses to the following legal arguments raised in Deloitte's motion for summary judgment: (1) Relator cannot establish that Deloitte or any entity presented a false claim to the Federal Government, (2) an intervening act, the State of Texas' review of Deloitte's rates, broke the chain of causation, and (3) a conspiracy violation under subsection 3729(a) (3) of the FCA must be predicated on proof of a violation of another subsection of the FCA. (Docket Entry No. 783–1 at p. 7)

Deloitte asserts that the Statement of Interest is an untimely response to its motion for summary judgment.

Because the United States filed its . . . Response outside of the time permitted, without prior leave of court, and without any attempt to demonstrate "good cause" for the delay, Deloitte moves to strike it under Fed.R.Civ.P. ("Rule") 16(b) and (f) and the Court's inherent power to control its own docket.

(Docket Entry No. 789–1 at p. 1)

The United States asks the court to deny Deloitte's motion to strike because the rules cited by Deloitte apply only to formal parties, and since "the United States declined intervention in this matter and is not a formal party . . . [those rules] do not apply to the United States in [this action]." (Docket Entry No. 791–1 at p. 1) Asserting that the Statement of Interest was filed as soon as the parties had completed their briefing and the United States had received copies of the parties' supplemental briefs, the United States argues that Deloitte should not be prejudiced by any tardiness in the filing of its Statement of Interest and declares that it does not oppose Deloitte's request to respond to its "amicus brief." (Docket Entry No. 791–1 at p. 2)

When, as in this case, the United States does not intervene in an FCA action, the *qui tam* plaintiff-relator is the only party who has the "right to conduct the action." 31 U.S.C. §§ 3730(b)(4) (B) and 3730(c)(3). However, the FCA also recognizes that even when the government does not intervene, the government maintains the right to be served with copies of all pleadings filed in the action and to be supplied with all deposition transcripts, 31 U.S.C. § 3730(b)(2); to limit discovery under certain circumstances, 31 U.S.C. § 3730(c)(4); to later intervene in the action if it so desires, upon a "showing of good cause" and "without limiting the status and rights of the person initiating the action," 31 U.S.C. § 3730(c)(3); to settle the action with the defendants over the objections of the individual bringing the action, 31 U.S.C. § 3730(c)(2)(B); and even to seek dismissal of the case, 31 U.S.C. § 3730(b). There is nothing in the FCA that prohibits the government from submitting an *amicus curiae* brief.

No statute, rule, or controlling case defines a federal district court's power to grant or deny leave to file an *amicus* brief, and the United States cites no authority in this regard. Federal Rule of Appellate Procedure 29 sets forth standards for filing an *amicus* brief in the United States Courts of Appeals, and in the absence of controlling authority, district courts commonly refer to Rule 29 for guidance. *Waste Management of Pa. v. City of York,* 162 F.R.D. 34, 36–37 (M.D.Pa.1995). The extent to which the court permits or denies *amicus* briefing lies solely within the court's discretion. *Id.* Factors relevant to the determination of whether amicus briefing should be allowed include whether the proffered information is "timely and useful" or otherwise necessary to the administration of justice. *Id.* at 36.

For more than six-and-a-half years the United States has stood on the sidelines of this case, content to allow the Relator to conduct this action on its behalf. Deloitte filed its motion for summary judgment on June 5, 2006 (Docket Entry No. 678); on July 11, 2006, Relator filed his response to Deloitte's motion for summary judgment (Docket Entry No. 702); and on July 26, 2006, Deloitte filed its reply to Relator's response. (Docket Entry No. 719) In an August 1, 2006, Order (Docket Entry No. 725), the court struck Relator's response to Deloitte's motion for summary judgment for being too long and too late, and ordered Relator to file an amended response by August 10, 2006. On August 10, 2006, Relator filed his amended response (Docket Entry No. 729), and on August 24, 2006, Deloitte filed an amended reply. (Docket Entry No. 736) On October 27, 2006, the court entered an Order granting each side fourteen days "to file any further responses, replies or submissions related to Deloitte's Motion for Summary Judgment and/or Relator's Motions for Partial Summary Judgment." (Docket Entry No. 762) The court's Order of October 27, 2006, provided that *"[t]his is the final extension of time for any submissions or briefing on the pending Motions for Summary Judgment."* (Docket Entry No. 762) (emphasis in original)

Although the United States asserts that the "Statement of Interest *responds* to ... arguments" made in Deloitte's motion for summary judgment (Docket Entry No. 783–1 at p. 7), the United States did not file its Statement of Interest until November 17, 2006, over five months after Deloitte filed its motion for summary judgment, and the United States did not seek leave to file its Statement of Interest. Regardless of whether the timeliness of the Statement of Interest is measured from June 5, 2006, the date Deloitte filed its motion for summary judgment, or from the court's final scheduling order of October 27, 2006, the Statement of Interest is

untimely because it was filed both after the submission date, which occurred twenty days after Deloitte filed its motion, and after the final date for filing anything responsive to any of the pending motions for summary judgment set by the court's Order of October 27, 2006. Since the United States has made no attempt to explain why the arguments it raised could not have been made before Deloitte filed either its amended reply to the Relator's response on August 24, 2006 (Docket Entry No. 719), or its supplemental brief in support of its motion for summary judgment on November 13, 2006 (Docket Entry No. 781), the court is not persuaded that the United States has shown good cause for its untimely filing.

Moreover, since the United States has not argued that Relator's counsel has inadequately argued the issues raised in the Statement of Interest, the court concludes that no prejudice would befall the United States from granting Deloitte's motion to strike. Regardless of the issues raised, if the court were to deny Deloitte's motion to strike, Deloitte would be entitled to answer the United States' arguments. Because the allowance of additional briefing at this late stage of the lawsuit would not only add to an already substantial record, but would also cause substantial prejudice to the parties and to the court by unnecessarily delaying the resolution of this action, the court concludes that additional briefing would not be helpful. For these reasons the court concludes that Deloitte's motion to strike the United States' Statement of Interest should be granted; the United States' Statement of Interest is neither timely nor useful, nor otherwise necessary to the administration of justice.

Although the court does not rest its decision on the criteria of Federal Rule of Appellate Procedure 29, the court notes that the United States' Statement of Inter-est would be untimely under that rule. In pertinent part Rule 29 provides

(e) Time for Filing. An amicus curiae must file its brief, accompanied by a motion for filing when necessary, no later than 7 days after the principal brief of the party being supported is filed. An amicus curiae that does not support either party must file its brief no later than 7 days after the appellant's or petitioner's principal brief is filed. A court may grant leave for later filing, specifying the time within which an opposing party may answer.

(f) Reply Brief. Except by the court's permission, an amicus curiae may not file a reply brief.

Fed. R.App. P. 29(e)-(f). Rule 29 is designed to ensure the timely resolution of claims presented:

[T]he 7–day period runs from when a brief is filed. The passive voice—"is filed"—is used deliberately . . .

The 7 day stagger [between filing of the principal brief and the supporting ami-cus brief] . . . is long enough to permit an amicus to review the completed brief of the party being supported and avoid repetitious argument. A 7–day period also is short enough that no adjustment need be made in the opposing party's briefing schedule. The opposing party will have sufficient time to review arguments made by the amicus and address them in the party's responsive pleading.

Fed. R.App. P. 29(e) Adv. Comm. Notes to 1998 Amend. Since the United States' Statement of Interest was filed more than seven days after Deloitte's motion for summary judgment was filed, and the United States did not seek leave of court to file it, the court concludes that it was untimely filed under Rule 29. Because the concerns of necessity and timeliness, which under-gird Rule 29, do not appear to be any less important in the district court than in the

court of appeals, the court concludes that the standards established by Rule 29 support its decision to grant Deloitte's motion to strike the United States' Statement of Interest. *See Abu–Jamal v. Horn,* 2000 WL 1100784, *4–5 (E.D.Pa.2000).

### III. *Cross–Motions for Summary Judgment*

Pending before the court are Relator's two motions for partial summary judgment and Deloitte's motion for summary judgment. For the reasons explained below, the court will deny Relator's two motions for partial summary judgment, and grant Deloitte's motion for summary judgment.

### A. Standard of Review

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment. Fed.R.Civ.P. 56(c). Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The Supreme Court has interpreted the plain language of Rule 56(c) to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not *negate* the elements of the nonmovant's case." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (*en banc*), (quoting *Celotex,* 106 S.Ct. at 2553–2554). If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the

pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. *Id.* (citing *Celotex,* 106 S.Ct. at 2553–2554). In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000). Factual controversies are to be resolved in favor of the nonmovant, "but only when … both parties have submitted evidence of contradictory facts." *Little,* 37 F.3d at 1075.

### B. Applicable Law

Relator's Third Amended Complaint contains two substantive counts: (1) Count One alleges fraud against the government in violation of the FCA; and (2) Count Two alleges conspiracy to defraud the government in violation of the FCA. (Docket Entry No. 397–1 at pp. 51–52) The *qui tam* provisions of the FCA allow private persons acting on behalf of the government to sue those who defraud the government and share in any proceeds ultimately recovered. *United States v. Bornstein,* 423 U.S. 303, 96 S.Ct. 523, 531 & n. 11, 46 L.Ed.2d 514 (1976).

Although Relator's Third Amended Complaint does not cite any specific subsection of the FCA that Deloitte is alleged to have violated, Relator argues that Deloitte has violated 31 U.S.C. § 3729(a)(1)-(3). (See Docket Entry No. 679–1 at pp. 1 and 9, and No. 680–1 at pp. 7–8.) Liability for violation of the relevant provisions of the FCA arises when any person

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government . . . [or]

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid . . .

31 U.S.C. § 3729(a). Congress has determined that for FCA purposes

the terms "knowing" and "knowingly" mean that a person, with respect to information—

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth of the information; or

(3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b). "The FCA applies to anyone who 'knowingly assist[s] in causing' the government to pay claims grounded in fraud, 'without regard to whether that person ha[s] direct contractual relations with the government.'" *United States ex rel. Riley v. St. Luke's Episcopal Hospital,* 355 F.3d 370, 378 (5th Cir.2004).

To prevail on Count One by establishing that Deloitte violated 31 U.S.C. § 3729(a)(1) or (2) Relator must prove that

(1) Deloitte presented or caused to be presented a false claim to the federal government, or Deloitte made, used, or caused to be used a false record or statement to get a false claim paid or approved by the federal government, (2) the claim was false or fraudulent; and (3) Deloitte knew the claim was false or fraudulent. *See United States v. Medica–Rents Co.,* 285 F.Supp.2d 742, 769 (N.D.Tex.2003) (citing *United States ex rel. Wilkins v. North American Construction Corp.,* 173 F.Supp.2d 601, 618 (S.D.Tex.2001)). In addition, most courts, including those in the Fifth Circuit, require a fourth element: materiality. "Liability for both a 'false claim' and a 'fraudulent claim' implicitly requires a showing that what makes the claim either false or fraudulent is material to the asserted claim of entitlement to receive money or property from the government." *Id.* (quoting *Wilkins,* 173 F.Supp.2d at 630). *See also United States v. Southland Management Corp.,* 326 F.3d 669, 679 (5th Cir.2003) (en banc) ("there should no longer be any doubt that materiality is an element of a civil False Clams Act case") (Jones, concurring) (citing *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 902 (5th Cir.1997) ("FCA interdicts material misrepresentations made to qualify for government privileges or services")).[3]

---

**3.** Some courts have also held that there is a damage element, i.e., proof that the United States suffered damages as a result of the false or fraudulent claim. *See, e.g., United States v. Intervest Corp.,* 67 F.Supp.2d 637, 646 (S.D.Miss.1999) (*Young–Montenay, Inc. v. United States,* 15 F.3d 1040, 1043 (Fed.Cir. 1994)). However, the "Supreme Court and the Fifth Circuit have rejected the additional requirement that the United States have suffered damages as a result of the false or fraudulent claim." *Wilkins,* 173 F.Supp.2d at 619 n. 10 (S.D.Tex.2001) (citing *Rex Trailer Co. v. United States,* 350 U.S. 148, 76 S.Ct. 219, 222, 100 L.Ed. 149 (1956) ("there is no requirement, statutory or judicial, that specific damages be shown")). Although *Rex Trail-*

*er* involved the Surplus Property Act instead of the False Claims Act, the court plainly stated that it had earlier recognized in *Marcus,* a case involving the False Claims Act, that there was no requirement that specific damages be shown. *Id.* at 222 & n. 4 (citing *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 388–389, 87 L.Ed. 443 (1943)). In *Marcus* the government discovered the fraud in time to withhold payments for many of the projects performed by the defendant. The defendants contended that because no actual damage could be shown in these instances, there could be no recovery. The district court held that failure to show actual damages would not prove fatal to the plain-

To prevail on Count Two by establishing that Deloitte violated 31 U.S.C. § 3729(a)(3) Relator must prove (1) that there was an agreement with another party to submit a false claim, and (2) that one or more conspirators performed an act to effect the object of the conspiracy. *See Wilkins*, 173 F.Supp.2d at 639 & n. 33. *See also United States ex rel. Graves v. ITT Educational Services, Inc.*, 284 F.Supp.2d 487, 509 (S.D.Tex.2003), *aff'd* 111 Fed. Appx. 296 (5th Cir.2004), *cert. denied*, 544 U.S. 978, 125 S.Ct. 1869, 161 L.Ed.2d 730 (2005).

■ Congress has established that a "claim" includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(c). The term "false. or fraudulent" is not defined in the FCA. *See Mikes v. Straus*, 274 F.3d 687, 696 (2d Cir.2001). "False" can mean "deceitful," or "tending to mislead," and a "false claim" is one "grounded in fraud which might result in financial loss to the Government." *Riley*, 355 F.3d at 378 (quoting *Webster's Third New International Dictionary*, 819 (1981), and *Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir.), *cert. denied*, 423 U.S. 830, 96 S.Ct. 50, 46 L.Ed.2d 47 (1975)). The Fifth Circuit has explained that "[i]t is only those claims for money or property to which a defendant is not enti-

tled that are 'false' for purposes of the False Claims Act." *Southland*, 326 F.3d at 674–675 (citing *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 677 (8th Cir.1998) ("[O]nly those actions by the claimant ... [calculated to] caus[e] the United States to pay out money it is not obligated to pay ... are properly considered 'claims' within the meaning of the FCA.")). *See also Wilkins*, 173 F.Supp.2d at 626 (collecting authorities for proposition that a "false claim" is a claim for more than one is due).

The FCA defines "knowingly" as: (1) possessing actual knowledge, (2) acting in deliberate ignorance of falsity, or (3) acting in reckless disregard of falsity. 31 U.S.C. § 3729(b). The requisite intent is thus the knowing presentation of what is known to be false; "which means that a lie is actionable but not an error." *Riley*, 355 F.3d at 378. The statute's definition of "knowingly" excludes liability for innocent mistakes or negligence. *See Southland*, 326 F.3d at 681–682 (Jones, J., concurring) (citing *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1074 (9th Cir.1998), and *Hindo v. University of Health Sciences*, 65 F.3d 608, 613–614 (7th Cir.1995)). Courts have thus rejected the proposition that claimants "knowingly" presented false claims where there were instances of "mere" contractual or regulatory noncompliance.

[T]he FCA is not an appropriate vehicle for policing technical compliance with administrative regulations. The FCA is a fraud prevention statute; violations of [agency] regulations are not fraud unless the violator knowingly lies to the government about them. *United States ex rel. Lamers v. City of Green Bay*, 168

---

tiff's cause of action under the False Claims Act. *United States ex rel. Marcus v. Hess*, 41 F.Supp. 197, 218 (W.D.Pa.1941). The Supreme Court, without discussion of this issue, affirmed the judgment of the district court. *See* 63 S.Ct. at 379. *See also United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F.Supp.2d 1017, 1047 (S.D.Tex. 1998), *remanded from* 125 F.3d 899 (5th Cir. 1997) ("a pecuniary injury to the public fisc is no longer required for an actionable claim under the FCA").

F.3d 1013, 1019 (7th Cir.1999). Innocently made faulty calculations or flawed reasoning cannot give rise to liability. *Wang ex rel. U.S v. FMC Corp.*, 975 F.2d 1412, 1420–21 (9th Cir.1992). Further, where disputed legal issues arise from vague provisions or regulations, a contractor's decision to take advantage of a position cannot result in his filing a "knowingly" false claim. *See United States ex rel. Siewick v. Jamieson Science & Engineering, Inc.*, 214 F.3d 1372, 1378 (D.C.Cir.2000); *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1478–79 (9th Cir.1996).

*Id.*

■ Claims are not "false" under the FCA when reasonable persons can disagree regarding whether service was properly billed to the Government. *See Thompson*, 125 F.3d at 902 ("claims for services rendered in violation of a statute do not necessarily constitute false or fraudulent claims under the FCA"). *See also United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir.1999) (holding that "errors based simply on faulty calculations or flawed reasoning are not false under the FCA ... [a]nd imprecise statements or differences in interpretation growing out of a disputed legal question are similarly not false under the FCA"); *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1477 (9th Cir.1996) ("How precise and how current the cost allocation needed to be in light of the [Water Supply Act's] imprecise and discretionary language was a disputed question within the [Government]. Even viewing [plaintiff's] evidence in the most favorable light, that evidence shows only a disputed legal issue; that is not enough to support a reasonable inference that the allocation was false within the meaning of the False Claims Act"); *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir.1996) (violations of laws, rules, or regulations alone do not create a cause of action under the FCA, but false certifications of compliance create liability under the FCA when certification is a prerequisite to obtaining a government benefit). The FCA "reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." *Id.* (quoting *Peterson*, 508 F.2d at 52) (recognizing that a false certification of compliance on a claim form submitted to the Government for payment is actionable under the FCA).

■ The government's knowledge of the alleged false claim is relevant to whether the defendant "knowingly" submitted a false claim. The inaptly-named "government knowledge defense" captures the understanding that the FCA reaches only the "knowing presentation of what is known to be false." *Id.* at 682 (citing *Hagood*, 81 F.3d at 1478). This defense suggests that the "knowing" submission of false or fraudulent claims is logically impossible when responsible government officials have been fully apprized of all relevant information. *Id.* Since the crux of an FCA violation is intentionally deceiving the government, no violation exists where relevant government officials are informed of the alleged falsity, thus precluding a determination that the government has been deceived. *Id. See also United States ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321, 327 (9th Cir.1995); *Wang*, 975 F.2d at 1421.

## C. Relator's Motions for Partial Summary Judgment

Relator has filed two motions for partial summary judgment as to liability against Deloitte. One motion seeks summary judgment that Deloitte knowingly "violated OMB Circular A–87 by failing to adhere to the requirements of the Texas State Plan Amendment that required the use of a time study to set rates for SHARS ser-

vices." (Docket Entry No. 679–1 at p. 1) Another motion seeks summary judgment that Deloitte knowingly "violated OMB Circular A–87 by including numerous categories of unallowable costs." (Docket Entry No. 680–1 at p. 1) Relator asserts that as a result of these violations by Deloitte

false claims were made or caused to be made to the government; [Deloitte] made or used a false record or statement to get a false or fraudulent claim paid or approved by the government; and [Deloitte] participated in a conspiracy to violate the False Claims Act.

(Docket Entry No. 679–1 at p. 1)

Deloitte argues in opposition that neither of Relator's motions for partial summary judgment should be granted because Relator fails to present evidence that supports his factual assertions, and because even if the court agrees with Relator that certain components of Deloitte's Rate Documentation Package were inconsistent with the SPA or the language of OMB Circular A–87, partial summary judgment on liability is not appropriate because Relator fails to present evidence that supports the *prima facie* elements of an FCA violation. (Deloitte Consulting LLP's Combined Brief in Opposition to Relator's Motions for Partial Summary Judgment (Indirect Cost) and (*Time Survey v. Time Study*), Docket Entry No. 699–1 at pp. 1 and 4)

### 1. *Time Survey v. Time Study Motion for Partial Summary Judgment*

Asserting that Deloitte violated the FCA, Relator moves for summary judgment as to liability that

- [Deloitte] violated OMB Circular A–87 by failing to adhere to the requirements of the Texas State Plan Amendment which required the use of a time study to set rates for SHARS services;
- As a result of [Deloitte's] actions false claims were made or caused to be

made to the government; [Deloitte] made or used a false record or statement to get a false or fraudulent claim paid or approved by the government;

- [Deloitte] acted knowingly.

(Relator's Motion for Partial Summary Judgment (*Time Survey v. Time Study*), Docket Entry No. 679–1 at p. 1) Asserting that the SPA required, as part of the SHARS rate-setting methodology, a time study "to capture the time distribution of service provider staff delivering each of the SH[A]RS ... [and that the time study was to] include direct contact time with the client, indirect time, time spent on administrative/supervisory activities, and time not related to SH[A]RS" (Docket Entry No. 679–3 at p. 41), Relator argues that he is entitled to summary judgment because Deloitte persuaded the state that it could use a time survey instead of a time study by falsely representing that (1) the HCFA had approved use of the survey method, (2) the survey method was adequate and representative of time spent by the total population of care providers, and (3) the survey responses were reliable and verified. (Docket Entry No. 679–1 at pp. 5–8)

(a) No Evidence Deloitte Violated SPA

Relator contends that Deloitte's "use of a [t]ime [s]urvey instead of a [t]ime [s]tudy as required by the Texas State Plan Amendment was a violation of the FCA as a matter of law." (Docket Entry No. 679–1 at p. 17; *see also* Relator's Reply to Deloitte's Response to Relator's Summary Judgment Motions, Docket Entry No. 722–1 at pp. 10–15.)

Deloitte does not dispute that the SPA required a time study to be conducted, or that it recommended use of a time survey to satisfy the SPA time study requirement. Instead, Deloitte argues that Relator cannot establish that a time survey was an unacceptable means for satisfying the time

study requirement and cannot establish that Deloitte knowingly violated the SPA. Deloitte argues that Relator's contention that it was required to perform a "time study" instead of a "time survey" has no basis in law or fact because in 1994 no federal or state statute or regulation defined the term "time study," that Deloitte fully disclosed to TDH its survey approach to measure time, and that Relator cannot present any evidence that Deloitte had not successfully used a survey method of measuring time in other states. (Deloitte Consulting LLP's Combined Brief in Opposition to Relator's Motions for Partial Summary Judgment (Indirect Cost) and (*Time Survey v. Time Study*), Docket Entry No. 699–1 at pp. 8–17 and 33–35)

### (1) *Time Survey v. Time Study*

■ Asserting that the SPA required Deloitte to conduct a time study, Relator argues that the phrase "time study" was a term of art that established a requirement that could not be satisfied unless a "period of time [was] selected during which all care providers track all their time spent on a daily basis." (Docket Entry No. 679–1 at p. 3)[4] Relator has not cited any authority in support of his argument that in 1994 the phrase " 'time study' in the Texas Plan had a very definite meaning." (Docket Entry No. 722–1 at p. 17) In contrast, Deloitte has presented uncontradicted testimony of its expert witness, Norman Brier; the state's two experienced rate-setters, Kimble and Phelps; Deloitte's experienced rate-setter, Christenson; and Relator himself that in 1994 the phrase "time study" was not defined in the SPA, was not defined in any applicable state or federal statute, regulation, or guideline, and was not a term of art. (Docket Entry No. 699–1 at p. 11)

Brier, Deloitte's expert witness, testified that Relator's definition of "time study" was not adopted by the federal government until 2006, more than a decade after Deloitte performed the work at issue in this lawsuit, and that "there was no—no common taxonomy regarding the collection of time information in 1993, '94 that I was aware of." (Brier Deposition at p. 189, Docket Entry No. 699–2 at p. 16) Brier explained that the phrases "time study" and "time survey" "carry no meaning of their own except as further described." (Brier Deposition at p. 187, Docket Entry No. 699–2 at p. 16) Brier also testified that he believed that the time survey conducted by Deloitte satisfied the SPA's time study requirement because "neither time study nor time survey are terms of art," and because the SPA drafted following Deloitte's work and approved in 1995 used the undefined phrase "time study" "to describe what Deloitte had actually done." (Brier Deposition at p. 181, Docket Entry No. 699–2 at p. 14)

Kimble, an expert TDH rate-setter, testified that " 'time study' can mean a lot to a lot of people" (Kimble Deposition at p. 53, Docket Entry No. 699–3 at p. 23), that in 1994 the phrase "time study" did not carry an exact definition (Kimble Deposition at p. 174, Docket Entry No. 699–3 at p. 27), that prior to 1997 the term "time study" was not defined in the Texas Administrative Code for any Medicaid services (Kimble Deposition at pp. 172–173, Docket Entry No. 699–3 at pp. 26–27), and

---

**4.** See also Relator's Supplemental Response to Deloitte's Motion for Summary Judgment and Relator's Supplemental Motion for Partial Summary Judgment—Indirect Cost and Supplemental Motion for Partial Summary Judgment—*Time Study v. Time Survey*, Docket Entry No. 780–1 at p. 20, where Relator as-

serts that "[a] 'time study' is a term of art in the Medicaid field that describes a detailed collection of staff time and clinical data regarding health status, medical conditions, service received, and resources used to provide reimbursable care from a large sample," but fails to cite any authority for his assertion.

that the 1997 amendments to the Texas Administrative Code that defined the phrase "time study" have never been applicable to the SHARS program. (Kimble Deposition at p. 173, Docket Entry No. 699–3 at p. 27) Kimble also testified that "modeling and sampling is a valid way to calculate rates." (Kimble Deposition at p. 175, Docket Entry No. 699–3 at p. 27)

Phelps testified that there was no recognizable difference between a "time study" and a "time survey" (Phelps Deposition at p. 140, Docket Entry No. 699–3 at p. 35), and when asked to describe a "time study" Phelps asked to add another adjective and then stated that "[a] valid time study would be a time study that's done with a representative sample. A time survey may very well not meet that representative sample criteria." (Phelps Deposition at p. 141, Docket Entry No. 699–3 at p. 35) Phelps also explained that the two terms could be used to describe different activities. For example, he agreed that a "time study" could be conducted by enlisting "participants to fill out a daily log, keeping track of what they do over a period of time and then input that data," that a "time survey" could be conducted by asking people to "give an estimate of how much time they spend on a daily basis providing different types of services and doing different types of work," and that if Deloitte did the latter Deloitte would not have conducted a "time study." (Phelps Deposition at pp. 141–142, Docket Entry No. 699–3 at pp. 35–36) However, when asked if he thought this last-described type of "time survey" would have violated the methodology described in the SPA approved by the federal government Phelps stated, "I just don't know that the feds would split hairs quite that closely." (Phelps Deposition at p. 142, Docket Entry No. 699–3 at p. 36)

Christenson testified that in 1994 there was no definition of the phrase "time study" in the SPA, OMB Circular A–87, or in any other state or federal statute, regulation, or guideline, and that there were alternative approaches to performing the requisite "time study." (Christenson Deposition at pp. 619–622, Docket Entry No. 779–4 at pp. 3–4)

When asked if there was anything in the Figliozzi report that caused him to have new thoughts or ideas about his analysis of the SHARS program, Relator responded

A.   No. I think in one area where he talks about the time study requirement ... he did not mention that there were alternative systems that could be used to perform the same kind of function as random moment sampling that he was talking about.

Q.   Did he—Was that an error in his report, as you see it?

A.   No. I think he did not consider the other possibilities.

(Gudur Deposition at pp. 114–115, Docket Entry No. 779–6 at p. 4) This testimony of Relator strongly suggests that even he does not believe the argument advanced in his briefing, i.e., that in 1994 the phrase " 'time study' in the Texas Plan [SPA] had a very definite meaning." (Docket Entry No. 722–1 at p. 17)

Since Relator has failed to cite any authority from which a reasonable fact-finder could conclude that in 1994 the phrase "time study" used in the SPA had a definite meaning or that the time survey conducted by Deloitte violated that meaning, while Deloitte has presented uncontradicted evidence that in 1994 the phrase "time study" was not defined in the SPA, was not defined in any applicable state or federal statute, regulation, or guideline, and was not used as a term of art, Relator has failed to raise a fact question much less establish that he is entitled to judgment as a matter of law that Deloitte's time survey approach violated the SPA's time study requirement.

## (2) Misrepresentations of Fact

Relator argues that Deloitte persuaded the state that a time survey could be used to satisfy the SPA's time study requirement by falsely representing that (1) the HCFA had approved use of the time survey method, (2) the time survey method was adequate and representative of time spent by the total population of care providers, or (3) the time survey responses were reliable and verified. (Docket Entry No. 679-1 at pp. 5-8) See also Relator's Reply to Deloitte's Response to Relator's Summary Judgment Motions at p. 11, Docket Entry No. 722-1 at p. 17 (arguing that the State of Texas "went along with Deloitte's 'survey' recommendation because Deloitte misrepresented that a 'survey' was a legally appropriate replacement for a 'study' ").

### (i) HCFA Approval of Time Survey Method

Citing a March 21, 1994, letter from Deloitte's David Bankard to TDH's Joseph Branton, for its statement that "[w]e have been able to satisfy time study requirements in other jurisdictions using a time survey approach" (Docket Entry No. 679-4 at p. 6), and a response "to comments received from the Texas Medicaid agency on September 6, 1994," contained in an unidentified document (Attachment N to Docket Entry No. 679, Docket Entry No. 679-4 at p. 23), Relator argues that Deloitte falsely represented to the State of Texas that the HCFA had approved use of its time survey method. (Docket Entry No. 679-1 at pp. 5-6) Citing page 59 of the Deposition of Kenneth Crow (Attachment D to Docket Entry No. 679, Docket Entry No. 679-2 at p. 24), Relator also argues that "[t]hese false statements resulted in Texas officials incorrectly believing that HCFA had specifically approved the survey approach." (Docket Entry No. 679-1 at p. 5) The court's review of the evidence cited by Relator shows that it does not support Relator's version of the facts.

### (A) Deloitte's March 1994 Letter to TDH

The March 21, 1994, letter from Bankard to Branton states that it was intended to summarize "discussions concerning our [i.e., Deloitte's] proposals to streamline the reporting requirements to reduce the SHARS administrative burdens to benefit both SHARS participating school districts and the Texas Department of Human Services." (Attachment K to Docket Entry No. 679, Docket Entry No. 679-4 at p. 4) The letter recognized that the Texas SPA "ties the reimbursement rates to an annual cost reporting process," contained a proposal aimed at eliminating "the annual cost reporting burden" by implementing a "base year rate methodology," and explained that "[t]he next steps toward implementation of a base year rate methodology is to discuss the approach with the Dallas regional office of the Health Care Financing Administration (HCFA) for concurrence, and submit a state plan amendment to HCFA for approval." (Attachment K to Docket Entry No. 679, Docket Entry No. 679-4 at pp. 4-5) Although the third page of the letter contains the allegedly false assertion that "[w]e have been able to satisfy time study requirements in other jurisdictions by using a survey approach" (Attachment K to Docket Entry No. 679, Docket Entry No. 679-4 at p. 6), Relator has not presented any evidence that Deloitte had not used a survey approach to satisfy time study requirements in other jurisdictions. Moreover, since the text of the letter recognizes that the methodology proposed therein was intended to streamline the rate-setting process and identifies the "next steps" to include discussions with the HCFA and submission of a state plan amendment for HCFA approval, even if the statement was false, the

state could not reasonably have relied on it to conclude that the HCFA had approved or would necessarily approve use of the proposed methodology in Texas.

(B) Deloitte's Responses to Comments

The second statement that Relator cites in support of its argument that Deloitte falsely represented to the State of Texas that the HCFA had approved use of the survey method appears in an unidentified document as a response drafted to the comment that "[t]he time study is a survey of best guesses, I'm not sure how HCFA will view this." (Attachment N to Docket Entry No. 679, Docket Entry No. 679–4 at p. 23) Although "Texas" appears in the document's header, "Chicago Public Schools" appears in its footer. Since, as Deloitte argues (Docket Entry No. 699–1 at p. 15), Relator has failed to submit any evidence that either identifies this document or shows that it was ever presented to Texas state officials, the court is not persuaded that the cited statement supports Relator's argument that Deloitte falsely represented to the State of Texas that its survey approach had been approved by the HCFA in other regions of the country.

(ii) Accuracy and Reliability of Time Survey

Citing statements contained in the same unidentified document as the previous statement, Relator argues that Deloitte falsely represented to the State of Texas that the time survey was accurate and reliable. The two statements are (Docket Entry No. 679–1 at pp. 6–8):(1) "use of a survey approach is considered accurate in the absence of detailed time and motion studies covering a full year because the survey approach considers the set-up and monitoring time required in different time[s] of the year when direct service intensity may vary" (Attachment N to Docket Entry No. 679, Docket Entry No.

679–4 at p. 19); and (2) "[c]omments received from the clinicians during the survey follow-up process related that the process was well explained and conceived." (Attachment N to Docket Entry No. 679, Docket Entry No. 679–4 at p. 19) Relator has not presented any evidence establishing either that in 1994 use of a time survey was not considered accurate in the absence of detailed time and motion studies covering a full year, or that comments received from clinicians following the survey process did not relate that the process was well explained and conceived. Moreover, since both of these statements appear in the same unidentified document with "Texas" in the header and "Chicago Public Schools" in the footer, Relator has failed to submit any evidence that this document was ever presented to Texas state officials; and the court is not persuaded that the cited statements support Relator's argument that Deloitte falsely represented to the State of Texas that its survey approach was accurate and reliable.

(3) State Reliance on Alleged Misrepresentations

Citing the deposition testimony of Christenson, Crow, and Phelps, Relator argues that "[t]he State of Texas relied on the misrepresentations and false statements by [Deloitte] in setting the SHARS rates." (Relator's Motion for Partial Summary Judgment (*Time Survey v. Time Study*), Docket Entry No. 679–1 at p. 8) None of the cited deposition testimony supports Relator's contention that Deloitte falsely represented that "the survey was adequate and in compliance with the Texas State Plan Amendment" or that the state relied on Deloitte's allegedly false statements in setting SHARS rates. (Docket Entry No. 679–1 at p. 8)

The cited excerpts from Crow's deposition do not relate to the time study issue

but, instead, to the indirect cost issue addressed in Relator's second motion for partial summary judgment. (Docket Entry No. 679–2 at pp. 23–24) The cited excerpts from Phelps' deposition show that Phelps questioned whether the state would be at risk if HCFA were to audit the SHARS program and that Phelps did not recall ever getting a satisfactory answer to that question. (Docket Entry No. 679–2 at p. 3) The cited excerpts from Christenson's deposition are not included in the attachments to the Relator's motion, and since neither party has submitted the entire deposition, the court is unable to consider the cited excerpt. None of these citations contain evidence from which a reasonable jury could conclude either that Deloitte made false statements to the State of Texas or that, even if Deloitte did make false statements to the State of Texas, the state relied on those statements in establishing reimbursement rates for the SHARS program.

(b) No Evidence of Liability

Relator argues that the following "facts ... not in dispute" establish that Deloitte's use of a time survey instead of a time study as required by the Texas State Plan Amendment constitutes a violation of the FCA as a matter of law:

A. The Texas State Plan Amendment called for the performance of a Time Study. (Attachment I, CMS 223)

B. [Deloitte] knew that a time study was required under the Texas State Plan Amendment. (Attachment P, PLTF 001–0003, Bankard to Branton March 21, 1994)

C. [Deloitte] recommended that the time study requirement be abandon[ed] and a time survey be used to set the SHARS rates. (Attachment P, Plt 001–0003, Bankard to Branton March 21, 1994.)

D. In an effort to convince the State of Texas to adopt the time survey approach, [Deloitte] falsely represented to the State of Texas that HCFA had approved use of Time Survey Method (Attachment P, PLTF 00003; Attachment N, PC 0046 (Tab 7); Bankard Deposition: 100:7–25; 107:9–109:10)

E. The State of Texas relied upon the false statements of [Deloitte] in adopting the [Deloitte] recommended rates. (Attachment D, Crow Deposition, 38:1–12, 59:12–14; Attachment A, Phelps Deposition; 78:21–78:7)[sic]

F. Failure to follow the State Plan Amendment in setting hourly reimbursement rates for SHARS creates a false claim against the United States Government exposing the Texas Medicaid Program to forfeiture of payments by the federal Medicaid program to the state of Texas. (Attachment A, Phelps Deposition, 117:6–15; Attachment B, Bankard Deposition, 212:1–18)

(Docket Entry No. 679–1 at pp. 17–18) Citing *Bornstein*, 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514, Relator argues that "[l]ongstanding case law holds that where, as here, the government is supplied with something that does not conform to contractual specifications, an FCA violation has occurred." (Relator's Reply to Deloitte's Response to Relator's Summary Judgment Motions at p. 13, Docket Entry No. 722–1 at p. 19)

There is no dispute that the SPA called for performance of a time study "to capture the time distribution of service provider staff delivering each of the SH[A]RS[,... that the time study was to] include direct contact time with the client, indirect time, time spent on administrative/supervisory activities, and time not related to SH[A]RS" (Docket Entry No.

679-3 at p. 41), and that Deloitte knew that the SPA required a time study for this purpose and recommended that a time survey be used to satisfy the SPA time study requirement. (Bankard Letter of March 21, 1994, Docket Entry No. 679-4 at pp. 5-7) Although Relator argues strenuously that in 1994 when Deloitte conducted the work at issue the phrase "time study" was a term of art that established a requirement that could not be satisfied unless a "period of time [was] selected during which all care providers track all their time spent on a daily basis" (Docket Entry No. 679-1 at p. 3),[5] for the reasons explained above, the court concludes that Relator has failed to present any evidence capable of raising a fact issue much less establishing as a matter of law that in 1994 the phrase "time study" was a term of art that meant what Relator argues it meant. Moreover, Deloitte has presented uncontradicted evidence that in 1994 the phrase "time study" did not constitute a term of art, was not defined in the Texas SPA, and was not defined in any applicable state or federal statute, regulation, or guideline. Although Relator also argues strenuously that Deloitte falsely represented to the State of Texas that the SPA's time study requirement could be satisfied by use of a time survey, for the reasons explained above, the court concludes that Relator has failed to present evidence showing that the statements he asserts were false were, in fact, false, or that TDH relied on those allegedly false statements in the fall of 1994 when it decided to adopt Deloitte's recommended reimbursement rates for four of the nine SHARS categories. For these reasons the court concludes that Relator has failed to present evidence that either raises a genuine issue of material fact or establishes that he is entitled to summary judgment that Deloitte's use of a time survey to satisfy the time study requirement violated the SPA, OMB Circular A-87, or any other Medicaid regulation. Accordingly, Relator's Motion for Partial Summary Judgment (*Time Survey v. Time Study* ) (Docket Entry No. 679) will be denied.

### 2. Indirect Cost Motion for Partial Summary Judgment

Relator moves for summary judgment as to liability that

· [Deloitte] violated OMB Circular A-87 by including numerous categories of unallowable costs;

· As a result of [Deloitte's] actions false claims were made or caused to be made to the government; [Deloitte] made or used a false record or statement to get a false or fraudulent claim paid or approved by the government; and [Deloitte] participated in a conspiracy to violate the False Claims Act;

· [Deloitte] acted knowingly.

(Relator's Motion for Partial Summary Judgment (Indirect Cost), Docket Entry No. 680-1 at p. 1) Relator argues that [i]n creating new SHARS rates, [Deloitte] was required to adhere to OMB Circular A-87 ("A-87") as it existed at the time of [Deloitte's] rate setting work.... [Deloitte] was familiar with all aspects of A-87 and its requirements.... As support for the SHARS rates it designed, [Deloitte] prepared a SHARS Medicaid Rate Documentation Package and a Medicaid Rate Methodology presentation.... Both of these documents were provided to Texas and its officials, and contained written assurances that the [Deloitte] proposed SHARS rates and rate setting methodology complied with A-87.... Nevertheless, [Deloitte's] SHARS rates included interest expense, land purchase costs and other costs not allowable by A-87.

---

**5.** See n. 4 above.

(Docket Entry No. 680–1 at p. 3) Asserting that "[o]f particular concern was that [Deloitte's] Indirect Cost Rate Multiplier ("ICRM") included costs such as interest costs that were expressly prohibited by A–87," Relator argues that the ICRM component of Deloitte's recommended SHARS reimbursement rates was inflated and that the inflated ICRM caused each and every reimbursement request submitted by SHARS providers in Texas since the adoption of Deloitte's rates to constitute a false claim. (Docket Entry No. 680–1 at pp. 3–5)

Deloitte argues that the court should reject Relator's new theory that its calculation of the ICRM constitutes a violation of Circular A–87 and/or the FCA because this theory is not based on admissible evidence. Deloitte also argues that even if its calculation of the ICRM departed in some technical way from the requirements of Circular A–87 that Relator's motion should be denied because Relator has failed to present any evidence that Deloitte knowingly departed from the technical requirements of Circular A–87, or that Deloitte concealed a knowing violation of Circular A–87 from the state. (Deloitte Consulting LLP's Combined Brief in Opposition to Relator's Motions for Partial Summary Judgment (Indirect Cost) and (*Time Survey v. Time Study*), Docket Entry No. 699–1 at pp. 19–32)

### (a) No Evidence Deloitte Violated OMB Circular A–87

In his Third Amended Complaint filed on January 14, 2004, Relator alleged that Deloitte's ICRM "appeared to include improper items that should have been excluded including nonallowable costs attributable to educational activities." (Docket

Entry No. 397–1 at p. 10) However, when Relator's expert witness, Peter J. Figliozzi, was asked during his deposition whether Deloitte's ICRM included improper items (i.e., "You're not asserting that costs within the PEIMS data [the data source for the indirect cost portion of the rate] that should not have been included in the indirect portion of the rate were actually included; are you?" He responded, "No."). (Figliozzi Deposition at pp. 285–286, Attachment F to Docket Entry No. 699, Docket Entry No. 699–3 at pp. 4–5) Moreover, despite recognizing the complicated nature of the indirect cost formula, when asked whether he thought that Deloitte had correctly calculated the ICRM, Figliozzi testified, "I traced it [i.e., Deloitte's indirect cost calculation] all through and I think it is correct." (Figliozzi Deposition at p. 286, Attachment F to Docket Entry No. 699, Docket Entry No. 699–3 at p. 5) Over six months later, on June 5, 2006, Relator filed his pending motion for partial summary judgment on Deloitte's calculation of its recommended ICRM. (Docket Entry No. 680) Citing Circular A–87 and Figliozzi's Second Supplemental Report of June 1, 2006, Relator now argues that Deloitte knowingly included costs unallowed by Circular A–87 in the calculation of its recommended ICRM of 67.13%. Realtor argues that

> [t]he Cumulative effect of [Deloitte's] violations of [Circular] A–87 (including some additional ones disclosed in Peter Figliozzi's Supplemental Report dated June 1, 2006[)] was that the indirect cost factor was improperly inflated to 67.13% when it should have been no higher than 37.4133%.

(Relator's Motion for Partial Summary Judgment (Indirect Cost), Docket Entry No. 680–1 at p. 26) [6] Relator argues that

---

**6.** See also Docket Entry No. 680–1 at p. 7 where Relator argues that "[t]he cumulative effect of these violations of A–87 cost principles and other improper accounting techniques employed by [Deloitte] was to inflate [Deloitte's] indirect cost rate by at least

unallowable costs included in the calculation of Deloitte's ICRM include: (1) interest and other financial costs, 2.7086%; (2) land purchase costs, 0.0041%; (3) general administrative costs, 12.873%; and (4) capital expenditures, 0.6559%. (Docket Entry No. 680–1 at pp. 19–23) Relator also argues that Deloitte improperly inflated its ICRM by an additional 0.3929% and 14.811% by failing to treat costs consistently. (Docket Entry No. 680–1 at pp. 25–26)

### (1) Figliozzi's Second Supplemental Report Has Been Stricken and His Testimony Excluded

Since Figliozzi's Second Supplemental Report is the only evidence that Relator has offered in support of his argument that Deloitte improperly inflated its recommended ICRM by including non-allowable costs in its indirect cost calculation, and since for the reasons explained in the Memorandum Opinion and Order (Docket Entry No. 803) granting Deloitte's motion to strike Figliozzi's Second Supplemental Report and granting Deloitte's motion to exclude all of Figliozzi's testimony, that report has been stricken and, in the alternative, excluded, Relator has failed to present any evidence that he is entitled to summary judgment that Deloitte inflated its recommended ICRM by improperly including in its calculation costs not allowed by Circular A–87. Moreover, even if the court had not decided to strike Figliozzi's Second Supplemental Report or to exclude his testimony entirely, the court would still not be persuaded to grant Relator's indirect cost motion for partial summary judgment because the opinions on this issue expressed in Figliozzi's Second Supplemental Report contradict, without explanation, his prior sworn deposition testimony, and because even if Deloitte did include

costs not allowed by A–87 in its indirect cost calculation, Relator has failed to present any evidence showing that Deloitte did so knowingly or that the incorrectly calculated ICRM caused Deloitte's recommended reimbursement rates to be fraudulently inflated.

### (2) Figliozzi's Second Supplemental Report Contradicts Figliozzi's Deposition Testimony

Contrary to the testimony that Figliozzi gave at his deposition, Figliozzi opines in his Second Supplemental Report that Deloitte improperly included costs not allowed by Circular A–87 in the calculation of its recommended ICRM and that the inclusion of those unallowed costs in that calculation fraudulently inflated the ICRM. Relator attempts to explain the contradiction between the opinions that Figliozzi expressed at his deposition (i.e., that Deloitte had correctly calculated its recommended ICRM and had not included unallowable costs in its calculations) and the opinions that Figliozzi expressed in his Second Supplemental Report (i.e., that Deloitte had incorrectly calculated its recommended ICRM and had included costs unallowed by Circular A–87) by asserting that Deloitte improperly concealed findings of its expert witness, Norman Brier, that Deloitte's indirect cost calculations contained discrepancies. (See Relator's Response to Deloitte Consulting LLP's Motion to Strike the June 1, 2006 Supplemental Report of Peter J. Figliozzi, Docket Entry No. 708–1 at p. 13.)

The Fifth Circuit has long held that a nonmoving party may not manufacture a dispute of fact merely to defeat a motion for summary judgment by offering affidavit testimony that contradicts, without ex-

32.6902% resulting in an indirect cost rate of 67.13% when the actual rate should have

been no higher than 37.4133%."

planation, his or her prior sworn testimony. *See S.W.S. Erectors, Inc. v. Infax, Inc.,* 72 F.3d 489, 495 (5th Cir.1996); *Thurman v. Sears, Roebuck & Co.,* 952 F.2d 128, 136 n. 23 (5th Cir.), *cert. denied,* 506 U.S. 845, 113 S.Ct. 136, 121 L.Ed.2d 89 (1992). As other circuit courts have observed,

> [i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

*Perma Research and Dev. Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir.1969). Factual issues created solely by an affidavit crafted to oppose a summary judgment motion are thus not "genuine" issues for trial. *Id.* Although Figliozzi is not a party but an expert witness, and his Second Supplemental Report is a report and not an affidavit, the court is persuaded that the principle applied in these cases precludes it from relying on the opinions expressed in Figliozzi's Second Supplemental Report to conclude either that Relator is entitled to partial summary judgment or that he has raised a genuine issue of material fact for trial on the indirect cost issue because Figliozzi was thoroughly questioned on this issue at his deposition, and the opinions expressed in his Second Supplemental Report do not supplement but, instead, contradict his previous sworn testimony. *See Clark v. Resistoflex Co., A Div. of Unidynamics Corp.,* 854 F.2d 762, 766–67 (5th Cir.1988) (summary judgment based on fact issue raised by subsequent affidavit was appropriate when attorney only asked one question on subject at deposition and thus affidavit supplemented instead of contradicted deposition testimony).

### (3) Deloitte's Evidence of Compliance with A–87

Without Figliozzi's Second Supplemental Report Relator has no evidence that Deloitte's indirect cost rate calculation contained costs not allowed by A–87. Moreover, since Deloitte has presented the uncontradicted testimony of Christenson that A–87 actually permits the practices that Relator alleges are prohibited, and that Deloitte's indirect cost calculations did not violate A–87 by including unallowable costs (see Docket Entry No. 699–1 at pp. 29–30, and No. 779–1 at pp. 11–12), the court concludes that Relator's motion for partial summary judgment on indirect cost should be denied. Even assuming without deciding that Relator had presented evidence that Deloitte included unallowable costs in the calculation of its recommended ICRM, the court would not be persuaded to grant Relator's motion for partial summary judgment because Relator has failed to present any evidence establishing that Christenson or anyone else at Deloitte possessed actual knowledge, acted in deliberate ignorance, or acted in reckless disregard of the fact that unallowable costs were included in Deloitte's indirect cost calculation. *See* 31 U.S.C. § 3729(b).

### (b) No Evidence Any Violation of A–87 was Knowing

Relator argues that Deloitte's failure to adhere to the requirements of A–87 was committed "knowingly" because

> Paul Christenson, [Deloitte's] rate setting expert and the person who performed the bulk of [Deloitte's] SHARS rate setting work testified that he was intimately familiar with the provisions of A–87. (Christenson Depo. 332:1–12, App. 4) Moreover, [Deloitte] as a major accounting firm had a duty to familiarize itself and to follow the guidelines im-

posed on it by the State of Texas and state and federal regulations and the failure to do so ... constitutes a knowing violation of the FCA ... Thus, [Deloitte], in including unallowable cost[.] items expressly prohibited by A–87 while providing written assurances of it's A–87 compliance, was either acting with actual knowledge of the false and fraudulent nature of its actions or at the very least with reckless disregard for the truth or falsity of its representations and actions.

(Docket Entry No. 680–1 at p. 27) Evidence that Deloitte in general or Christenson in particular were intimately familiar with the provisions of Circular A–87 is not sufficient to establish that Relator is entitled to summary judgment that Deloitte knowingly violated Circular A–87 by including unallowable costs in the indirect cost calculation, that Deloitte falsely provided written assurances of it's A–87 compliance, or that Deloitte knowingly concealed from the State of Texas its inclusion of unallowable costs in its indirect cost calculation.

For the reasons explained above, in § III.C.2(a)(1)-(2), the court has already concluded that Relator has failed to present evidence establishing that Deloitte failed to adhere to the requirements of A–87 in calculating its ICRM. Deloitte argues that Relator's assertions that it violated written assurances that its rate-work complied with A–87 or that Deloitte concealed the fact that it violated A–87 are baseless and contradicted by the evidence. (See Docket Entry No. 699–1 at p. 34.)

Relator argues that in numerous presentations to state officials Deloitte falsely assured the state that its rate work complied with A–87. Relator also argues that these assurances itemized categories of costs included in its indirect cost rate but failed to disclose that its calculation of that rate also included four categories of costs

not allowed by A–87: (1) interest costs; (2) land purchase costs; (3) general administrative costs; and (4) costs related to capital expenditures for equipment. (Docket Entry No. 680–1 at pp. 19–25) Relator cites three instances in which he argues that Deloitte falsely assured the state that its rate-setting work was "fully compliant with A–87" (Docket Entry No. 680–1 at p. 23):(1) the executive summary of its Rate Documentation Package, (2) the body of its Rate Documentation Package, and (3) the August 15, 1994, presentation to the Texas Department of Health. Although Relator argues that Deloitte relied on the cited statements from these three documents to conceal the fact that the calculation of its recommended indirect cost rate included the four categories of costs not allowed by A–87, review of the three statements cited by Relator shows that they did not contain any assurance that Deloitte had fully complied with A–87, and at least one of these three statements does not conceal but, instead, discloses the fact that the indirect rate calculation included two of the cost categories that Relator argues Deloitte concealed: general administration and capital costs.

The passage from the executive summary cited by Relator states that

[i]ndirect costs related to the provision of SHARS services were identified by using an indirect cost rate mechanism using state-wide cost data captured in the Texas Education Agency (TEA) certified financial accounting system. The indirect cost rate methodology utilizes recognized cost accounting principles as described in the Office of Management and Budget Circular A–87. Supply and material costs were included in the indirect cost rate in order to minimize school reporting requirements. *Also included in the indirect cost rate is general school administrative overhead, special education overhead, plant operation*

*and maintenance costs, and costs of capital.* The indirect cost rate is applied to direct costs to determine indirect costs.

(Docket Entry No. 680–6 at p. 11) (emphasis added) Contrary to Relator's assertion that Deloitte concealed the fact that its indirect rate calculation included general administration and capital costs, this passage plainly states that these costs are included in that calculation. Moreover, since Relator and his expert witness, Figliozzi, both reached their conclusions that Deloitte's recommended rates were formulated fraudulently based entirely on their review of the Rate Documentation Package that Deloitte provided to the State, the court is not persuaded that Relator has presented evidence from which a reasonable jury could conclude that Deloitte concealed evidence of its alleged fraud from the State.

(c) Relator Failed to Establish Liability

For the reasons explained above, the court concludes that Relator has failed to present evidence establishing that he is entitled to summary judgment that Deloitte included costs not allowed by Circular A–87 in the calculation of its recommended ICRM, that Deloitte falsely assured the state that its rate work complied with A–87, or that Deloitte concealed from the state its inclusion of costs not allowed by A–87 in its ICRM calculations. Accordingly, Relator's Motion for Partial Summary Judgment (Indirect Cost) (Docket Entry No. 680) will be denied.

## D. Deloitte's Motion for Summary Judgment

Relator originally asserted three FCA claims against Deloitte and numerous other defendants: (1) that Deloitte received illegal, percentage-based fees; (2) that Deloitte participated in fraudulent billing practices; and (3) that Deloitte wrongfully inflated the reimbursement rates that it recommended the State of Texas promulgate for SHARS providers. On August 29, 2002, the court granted Deloitte's motion to dismiss all of Relator's claims but allowed Relator to replead his third claim. On January 14, 2004, Relator filed his Third Amended Complaint in which he asserted two claims based on allegations that Deloitte fraudulently inflated the reimbursement rates that it recommended the State of Texas promulgate for SHARS providers: (1) that Deloitte "knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government under Medicaid . . . specifically with regard to the SHARS reimbursement rate" (Docket Entry No. 397–2 at p. 11); and (2) that Deloitte "and the enumerated School District Defendants, including the Client School Districts, the Cost Study Defendants, and the Time Study Defendants . . . knowingly conspired to get false or fraudulent claims paid or approved by the United States Government under Medicaid . . . specifically with regard to the SHARS reimbursement rate." (Docket Entry No. 397–2 at p. 12)

Deloitte's motion for summary judgment seeks adjudication of both of Relator's claims on the grounds that plaintiff cannot prove the essential elements of a FCA claim. Deloitte argues that it is entitled to summary judgment on both of Relator's claims because (1) there is no evidence that any school district made any claim under the SHARS program based on a false or fraudulent reimbursement rate, (2) if any such claim were false Relator cannot show that Deloitte caused the government to pay it, (3) there is no evidence that Deloitte knew any claim submitted for reimbursement under the SHARS program was false, and (4) there is no evidence that Deloitte conspired with any school district

to unlawfully inflate rates for SHARS services. Relator argues that

Deloitte's motion should be denied because genuine issues of material fact exist as to whether Deloitte caused the submission of false claims; whether Deloitte's 'rates' were in fact used by the State; whether the rates used were false, incorrect and inaccurate; whether Deloitte's conduct was deliberately ignorant and reckless; and whether a reasonable jury could conclude that evidence of a conspiracy existed.

(Docket Entry No. 729–1 at p. 7)

### 1. *Count One: False Claims*

Relator's allegations that Deloitte "knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government under Medicaid ... specifically with regard to the SHARS reimbursement rate" (Docket Entry No. 397–2 at p. 11) assert violations of 31 U.S.C. § 3729(a)(1)-(2).

### (a) No Evidence of Falsity

"It is only those claims for money or property to which a defendant is not entitled that are 'false' for purposes of the False Claims Act." *Southland*, 326 F.3d at 674–675 (citing *Costner*, 153 F.3d at 677 and *Wilkins*, 173 F.Supp.2d at 626). In this case no FCA liability arises unless Relator can present evidence from which a reasonable fact-finder could conclude that Deloitte caused the school districts and/or the State of Texas to present claims to the federal government for money to which they were not entitled. In order to establish "falsity" there must be evidence of a claim that was aimed at extracting money the government otherwise would not have paid. *See id.* at 674–674.

Deloitte argues that there is no evidence that any claim was ever presented to the federal government under the SHARS program based on a false or fraudulently inflated reimbursement rate that it recommended to the State of Texas. Deloitte argues that this fundamental failure requires summary judgment on all of Relator's FCA claims because "without a clear showing that a claim for reimbursement was false, Relator's allegations under the False Claims Act must fail." (Docket Entry No. 678–2 at p. 21)

### (1) **No Evidence of Falsity Based on Grossly Inflated Reimbursement Rates**

■ As evidence that Deloitte's recommended rates were "grossly inflated" Relator cites only the expert reports of Peter J. Figliozzi, which have been stricken and/or excluded for reasons stated in a separate Memorandum Opinion and Order (Docket Entry No. 803). Moreover, since Figliozzi did not provide any evidence from which a reasonable fact-finder could conclude that Deloitte's recommended SHARS rates were higher than the actual costs school districts incurred in providing SHARS-related services, even if the court had not stricken Figliozzi's Second Supplemental Report and had not excluded Figliozzi's two earlier reports and his deposition testimony, the court would still conclude that Relator had failed to present evidence from which a reasonable fact-finder could conclude that the reimbursement rates that Deloitte recommended the State of Texas promulgate for the SHARS program were inflated.

At his deposition Figliozzi testified that he had not made any calculations to test Deloitte's recommended rates, could not state with any certainty whether Deloitte's proposed rates were too high or too low, and had no opinion as to what accurate reimbursement rates would have been. (Figliozzi Deposition at pp. 379, 423–425, 676–679, Docket Entry No. 676–2 at pp. 29

and 33, and Docket Entry No. 676–3 at pp. 5–6) Figliozzi also testified that only the use of reimbursement rates that were too high, i.e., higher than the actual costs that school districts incurred providing SHARS-related services, would have caused false claims to be submitted to the federal government. (Figliozzi Deposition at p. 425, Docket Entry No. 676–2 at p. 33) Because Figliozzi could not state with certainty that Deloitte's recommended reimbursement rates were higher than the actual costs school districts incurred in providing SHARS-related services, Figliozzi failed to provide evidence from which a reasonable fact-finder could conclude that Deloitte's recommended rates were inflated or that the State's promulgation of those rates caused false claims to be presented to the federal government. *See Southland,* 326 F.3d at 674–675.

### (2) No Evidence of Falsity Based Regulatory Violations

Relator argues that "what the precise rate should have been—how high or low the rates should have been—is irrelevant to whether or not a Medicaid claim is false" because other theories of FCA liability apply in this case. Relator argues "where, as here, the government is supplied with something that does not conform to contractual specifications, an FCA violation has occurred." (Docket Entry No. 729–1 at p. 9) Citing *Thompson,* 125 F.3d at 902, and *Willard,* 336 F.3d at 375, for the principle that "[r]egulatory violations that result in the federal government paying amounts it does not owe creates liability under the FCA" (Docket Entry No. 729–1 at p. 9), Relator argues that "[i]t is exactly such regulatory violations and material misrepresentations that are present in the instant action where Deloitte violated many Medicaid regulations in calculating the SHARS rates and therefore caused false claims to be submitted." (Docket Entry No. 729–1 at pp. 9–10)

Asserting that "[u]nder applicable law ... SHARS rates were required to be calculated utilizing a specific and defined rate-setting methodology detailed in both the Texas Administrative Code [TAC] and in a later amendment to the State Medicaid Plan [i.e., the SPA]" (Docket Entry No. 729–1 at p. 8), Relator argues that Deloitte caused the State of Texas to submit false claims for Medicaid funds. Conspicuously absent from Relator's presentation is any cite to specific provisions in either the TAC or the SPA showing what the allegedly "specific and defined rate-setting methodology detailed in both the Texas Administrative Code and in a later amendment to the State Medicaid Plan [i.e., the SPA]" (Docket Entry No. 729–1 at p. 8) entailed, or any evidence from which a reasonable fact-finder could conclude that Deloitte's violation of that methodology caused the submission of claims for payments that the federal government did not owe.

Claims for services rendered in violation of even a "specific and defined rate-setting methodology" do not necessarily constitute false or fraudulent claims under the FCA. *Thompson,* 125 F.3d at 902. In *United States ex rel. Weinberger v. Equifax, Inc.,* 557 F.2d 456, 460–61 (5th Cir.1977), the Fifth Circuit held that claims submitted by a government contractor who allegedly violated the Anti–Pinkerton Act did not necessarily constitute false or fraudulent claims under the FCA because the FCA is not an enforcement device for the Anti–Pinkerton Act. However, the court recognized that the FCA "interdicts material misrepresentations made to qualify for government privileges or services." *Id.* at 461.

In *United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1266 (9th Cir.1996), the Ninth Circuit adopted a similar approach regarding the FCA's scope. In *Hopper* a

teacher accused her school district of making a false claim for special education funds by failing to comply with state and federal laws governing special education services. The Ninth Circuit held that the teacher could not maintain an action under the FCA because the school district did not make a false claim when it certified that it " 'will meet ... all requirements of state and federal law.' " *Id.* at 1267. The Ninth Circuit explained that the school's certification was not a false certification of a present fact, and there was no allegation that improper payment was based on the school district's certification. *Id.* "The court concluded, however, that false certifications of compliance create liability under the FCA when certification is a prerequisite to obtaining a government benefit." *Thompson*, 125 F.3d at 902 (citing *Hopper*, 91 F.3d at 1266). In *Thompson* the Fifth Circuit cited *Hopper* in support of its conclusion that

> where the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation.

125 F.3d at 902.

These cases establish that the appropriate inquiry is whether a government claimant has certified compliance with the regulation at issue and whether certification of compliance with the regulation at issue was a condition to receipt of federal funds. A general statement of adherence to all regulations or statutes governing participation in a program through which federal funds are received is an insufficient basis on which to premise FCA liability. *See Hopper*, 91 F.3d at 1266–1268. The Fifth Circuit has emphasized that liability for a false certification will lie only if compliance with a statute or a regulation was a prerequisite to government payment, and the defendant affirmatively certified such compliance. *See Thompson*, 125 F.3d at 902 (citing *Hopper*, 91 F.3d at 1266); *Southland*, 326 F.3d at 674–675.

Applied to the summary judgment record in this case, these authorities require the court to conclude that Relator has failed to raise a genuine issue of material fact for trial on his claim that Deloitte's alleged regulatory violations caused the submission of false claims because Relator has failed to cite any authority or present any evidence either that Deloitte certified compliance with any of the regulatory provisions he alleged Deloitte violated or that certification of compliance with any of those regulatory provisions was a prerequisite to receipt of federal funds. *See Thompson*, 125 F.3d at 902 ("violations of laws, rules, or regulations alone do not create a cause of action under the FCA ... [F]alse certifications of compliance create liability under the FCA when certification is a prerequisite to obtaining a government benefit."). *See also Hopper*, 91 F.3d at 1266 (under the facts of that case certification of assurances that school district would comply with applicable federal law was not a "prerequisite" to receipt of federal funds).

In *Thompson* the Fifth Circuit reversed the district court's Rule 12(b)(6) dismissal upon concluding that the court was "unable to determine from the record before [it] whether, or to what extent, payment for services identified in the defendants' annual cost reports was conditioned on defendants' certifications of compliance." *Thompson*, 125 F.3d at 902–903. Since unlike *Thompson* this action is at the summary judgment stage, Relator's failure to cite any authority or present any evidence that Deloitte certified compliance with any of the regulatory provisions he alleges Deloitte violated or that certification of compliance with any of those regulatory provisions was a

prerequisite to receipt of federal funds is fatal to his attempt to survive Deloitte's motion for summary judgment on grounds that Relator has failed to present evidence that any claims submitted on the basis of its recommended rates were false claims for FCA purposes. Moreover, even had Relator made these showings, the court would still conclude that he had failed to raise a genuine issue of material fact for trial on this issue because conspicuously absent from Relator's briefing is any cite to any specific provisions in either the TAC or the SPA showing what the allegedly "specific and defined rate-setting methodology detailed in both the Texas Administrative Code and in a later amendment to the State Medicaid Plan [i.e., the SPA]" (Docket Entry No. 729–1 at p. 8) entailed, or any evidence from which a reasonable fact-finder could conclude that Deloitte's rate-setting work failed to comply with that methodology.

Relator argues that "[b]y formulating rates that violated the express terms of the State Plan, Deloitte caused all subsequent claims using those rates to be tainted because the federal government was fraudulently induced to pay those claims." (Docket Entry No. 729–1 at p. 34) Relator's argument that Deloitte's alleged regulatory violations caused false claims to be submitted for government funds is grounded on his contention that in formulating the SHARS reimbursement rates that it recommended to the State of Texas, Deloitte wrongfully violated the SPA by using data gathered pursuant to a "time survey" instead of a "time study," wrongfully violated OMB Circular A–87 by including unallowable costs in the calculation of its ICRM, and wrongfully failed to include a laundry list of additional tasks in its rate-setting methodology including, *inter alia*, auditing its results, weighting its data, or employing larger representative samples of data.

Both parties discuss at length the meaning of the phrase "time study" and whether Deloitte's use of data from a "time survey" violated the SPA's "time study" requirement. In brief, Relator argues the phrase "time study" is a term of art with a definite meaning while Deloitte argues that in 1994 when the rate work at issue in this case was conducted "time study" was not a term of art and was not defined in the SPA, or in any applicable state or federal statute, regulation, or guideline. Relator argues that "[d]espite the mandatory requirement for a 'time study,' Deloitte opted for a less accurate 'survey' approach, which was clearly in violation of the federally pre-approved methodology." (Docket Entry No. 729–1 at p. 12) Both parties also discuss at length the role that OMB Circular A–87 played in the rate-setting process and whether certain costs that Relator argues were wrongfully included in Deloitte's calculations were included and/or, if so, whether their inclusion was wrongful. Although Relator faults Deloitte for failing to include a laundry list of additional tasks in its rate-setting methodology including, *inter alia*, auditing its results, weighting its data, or employing larger representative samples of data, Relator fails to cite any authority or present any evidence from which it may be concluded that SHARS rates could not lawfully be set without performing these tasks. For the reasons explained in § III.C. above, the court has already concluded that Relator has failed to present any evidence capable of raising a genuine issue of material fact that in 1994 there existed a "specific and defined rate-setting methodology" for the SHARS program that required Deloitte to audit its results, weight its data, or employ larger representative samples. Nor has Relator presented any evidence from which a jury could conclude that Deloitte's use of a "time survey" violated the SPA's "time study" requirement,

or that Deloitte's calculation of its recommended ICRM violated the unallowable cost provisions of OMB Circular A–87.

### (3) No Evidence of Falsity Based on Misrepresentations

■ Citing *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir.1999), Relator argues that

[i]n the present case, the Medicaid program requires that a State Plan, and any proposed deviations from the Plan, be formally approved, in advance, by HCFA using a formal Amendment process. Failure to adhere to the provisions of a Plan voids the right to reimbursement. (Ex. 10b, Phelps, 127:21–128:14; Ex. 1b, TEA 312; Ex. 5a, CMS 268–270) The evidence previously outlined proves that the Plan at issue here mandated use of a specific rate-setting methodology, that Deloitte knew of this requirement, and that Deloitte violated the requirement in a willful and malicious manner.

The evidence also proves that Deloitte was well aware of the legal requirements established by Circular A–87 … and that Deloitte repeatedly deviated from the requirements in an improper fashion. Deloitte's improper rate calculations triggered liability under the FCA and tainted all claims submitted by the school districts.

(Docket Entry No. 729–1 at p. 23)

In *Harrison*, 176 F.3d at 788, the court explained that courts have found FCA violations even where the defendant satisfactorily performed the work required for payment or receipt of benefits under a government contract, meeting the specifications, schedule, and the price agreed. FCA "liability attached, however, because of the fraud surrounding the efforts to obtain the contract or benefit status, or the payments thereunder." *Id.* The Fifth Circuit has recognized that "entering into a contract with no intention of performing may constitute fraud in the inducement," and that *Harrison* is one of the "the most prominent of cases in which FCA liability was imposed when the contract was obtained originally through false statements or fraudulent conduct." *Willard*, 336 F.3d at 384. The Fifth Circuit explained that

[g]enerally, 'there is no inference of fraudulent intent not to perform from the mere fact that a promise made is subsequently not performed.' … However, where substantial nonperformance is coupled with other probative factors, such as 'where only a short time elapses between the making of the promise and the refusal to perform it, and there is no change in the circumstances,' an intent not to perform when the promise was made may, in appropriate circumstances, be properly inferred. Therefore, the requisite intent must be coupled with prompt, substantial nonperformance to demonstrate fraud in the inducement. It must be shown that the defendant promptly followed through on its intent not to perform by substantially failing to carry out its obligations under the contract.

*Id.* at 385–386. The Fifth Circuit has also recognized that absent proof that a regulatory violation has occurred there can be no viable fraud-in-the-inducement claim. The Fifth Circuit explained that

[i]t would be illogical to find fraud where a party secretly did not intend to perform the contract when it was signed, but in actuality did perform, as the civil law generally regulates actions, not thoughts alone. This requirement is also necessary because the government must suffer an injury in fact for there to be standing.

*Id.* Relator's attempt to raise a genuine issue of material fact based on a fraud-in-the-inducement theory fails because the

court has already concluded that Relator failed to present any evidence from which a reasonable fact-finder could conclude that Deloitte committed a regulatory violation in formulating its recommended SHARS rates (see § III.C. above). Moreover, for the reasons explained below, the court concludes that Relator has failed to present any evidence from which a reasonable fact-finder could conclude that Deloitte fraudulently induced the State to accept either its rate-setting assistance or its recommended rates.

Relator's contention that Deloitte fraudulently induced the State to accept is offer of rate-setting assistance and its recommended SHARS rates is premised on his assertion that the rate-setting documentation provided by Deloitte to the State of Texas contained false statements. Relator argues that

> [t]he purpose of the Deloitte documentation was to convince the State to adopt non-compliant and fraudulently inflated rates calculated by Deloitte. In order to succeed in its plan, Deloitte included numerous false statements in the documentation that fraudulently assured the State that the rates were compliant with the State Plan as amended, Circular A–87, and other applicable federal and state requirements, when Deloitte knew for a fact that those representations were false. The Deloitte false rates were ultimately approved, and claims using the false rates were in fact submitted to the federal government for payment/reimbursement. As such, Deloitte is liable under 3729(a)(2) because it made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the government.

(Docket Entry No. 729–1 at p. 29) Conspicuously absent from Relator's presentation is any cite to any specific false statements in Deloitte's rate documentation that fraudulently assured the State that the

rates were compliant with the SPA, Circular A–87, and other applicable federal and state requirements, or any evidence from which a reasonable fact-finder could conclude that those materials contained false statements. Nevertheless, since Relator enumerated a number of allegedly false statements in his two motions for partial summary judgment, which the court discussed at length in previous sections of this Memorandum Opinion and Order, for the reasons explained above in § III.C.1(a), the court concludes that Relator has failed to present any evidence from which a reasonable trier of fact could conclude that Deloitte's rate documentation falsely assured the State that its recommended rates were compliant with the SPA, and for the reasons explained above in § III.C.2(a), the court concludes that Relator has failed to present any evidence from which a reasonable trier of fact could conclude that Deloitte's rate documentation falsely assured the State that its recommended rates were compliant with OMB Circular A–87.

Accordingly, the court concludes that Relator has failed to raise a genuine issue of material fact for trial that Deloitte can be found liable for FCA violations on grounds that Deloitte fraudulently persuaded the State to accept its rate-setting assistance or to adopt its recommended rates, or that Deloitte created false statements or records.

#### (b) No Evidence of Knowledge

■ Deloitte argues that Relator has produced no direct evidence or any evidence from which a jury could reasonably infer that Deloitte had actual knowledge, or that it was deliberately ignorant or recklessly indifferent that its rate recommendations were fraudulently inflated. Without disputing Deloitte's assertion that he has failed to present any evidence from which a reasonable jury could conclude

that Deloitte actually knew that its recommended rates were fraudulently inflated, Relator argues that Deloitte "acted recklessly and maliciously in concealing the truth and misleading the State." (Docket Entry No. 729–2 at p. 2) Relator responds that Deloitte's fraudulent intent is evidenced by its regulatory violations and its profit motive. (Docket Entry No. 729–1 at pp. 37–39 and 729–2 at pp. 1–7) [7] Review of the record shows that Relator has failed to present evidence from which a reasonable jury could conclude that Deloitte had direct knowledge that its recommended SHARS rates were inflated, or that Deloitte acted in deliberate ignorance or reckless disregard of the truth or falsity of its recommended SHARS rates.

### (1) No Evidence of Knowledge Based on Comments of State Officials and Regulatory Violations

Citing his own deposition testimony, and the reports prepared by Kimble and Phelps, Relator argues that "Deloitte's Mr. Christenson was personally told that the rates appeared questionable; that the rates appeared to be excessive; that the data appeared questionable; and that legitimate concerns existed as to whether the methodology was in violation of the Medicaid rules and regulations." (Docket Entry No. 729–2 at pp. 2–3, citing Gudur Deposition at pp. 881 and 883, Exhibit 14d attached to Docket Entry No. 729–10 at p. 9) [8] Relator argues that instead of addressing the concerns honestly, Deloitte "rejected the criticisms and instead misrepresented the basis for [its] work in a clear effort to justify fraudulent conduct." (Docket Entry No. 729–2 at p. 3) Asserting that De-

loitte was "not a novice in the area of school-based rate-setting under Medicaid" (Docket Entry No. 729–2 at p. 3), Relator argues that "Deloitte cannot lightly pass off reckless misbehavior and lies with a claim of simple mistake." (Docket Entry No. 729–2 at p. 4)

The premise of Relator's argument is that because Deloitte is experienced in the area of Medicaid rate setting, the regulatory violations that Relator asserts tainted Deloitte's SHARS rate-setting methodology cannot reasonably be the result of mistake but, instead, must be the result of fraud, e.g., deliberate ignorance or reckless disregard of the truth. Relator's argument is also premised on his belief that "[u]nder applicable law ... SHARS rates were required to be calculated utilizing a specific and defined rate-setting methodology detailed in both the Texas Administrative Code [TAC] and in a later amendment to the State Medicaid Plan [i.e., the SPA]." (Docket Entry No. 729–1 at p. 8) However, Deloitte has presented uncontroverted evidence that in 1994 no specific and defined SHARS rate-setting methodology existed.

Kimble testified that in 1994, outside of the general approach outlined in the SPA, there was little guidance for Deloitte to consider in formulating its rate recommendations, and that "specificity of the [SHARS] rate-setting methodology is not now nor was [it] at that time there." (Kimble Deposition at pp. 141 and 143, Docket Entry No. 678–6 at pp. 10–11) Kimble also testified that rate setting involves judgment that includes choosing between a variety of different approaches and ways of analyzing data, and that Med-

---

**7.** Because the court's electronic filing system cannot bundle more than 40 pages of text into a single entry, and because Relator's Response to Deloitte's Motion for Summary Judgment exceeded 40 pages in length, Docket Entry Numbers 729–1 and 729–2 are parts of the same instrument.

**8.** Although Relator cites p. 883 of his deposition and indicates that it is included in Exhibit 14d submitted with his response to Deloitte's motion for summary judgment, p. 883 is not included in Exhibit 14d.

icaid permits variations in rate-setting approaches as long as the overall approach is consistent with the SPA. (Kimble Deposition at pp. 131–132, Docket Entry No. 678–6 at p. 9) Dr. Roberta Kreb, an expert in Medicaid regulations, agreed that "[o]utside of very general guidelines, neither the specific process nor the design of the methodology was mandated or defined by" the "federal or state regulations." (Kreb Deposition at p. 219, Docket Entry No. 678–6 at p. 27) Kreb explained that states have great flexibility in the scope of services that are reimbursable, the method of rate setting, and the resulting rates, and that a state's flexibility in these areas is limited only by the terms of the state plan approved by the HCFA. (Kreb Deposition at pp. 224–225, Docket Entry No. 678–6 at p. 28)

In contrast, Relator has failed to cite any evidence in support of his contention that Deloitte's rate-setting work was governed by "a specific and defined rate-setting methodology," that Deloitte's rate-setting methodology violated regulatory requirements, or that Deloitte's recommended rates were artificially inflated. Moreover, the state's experienced rate-setters, Kimble and Phelps, concluded otherwise. Phelps testified that he had no reason to believe that Deloitte manipulated data to artificially inflate the SHARS rates. (Phelps Deposition at p. 238, Docket Entry No. 678–7 at p. 26) Kimble testified that Deloitte's approach of establishing a direct cost rate and then adjusting it to include indirect costs and costs of indirect service delivery was an appropriate approach. (Kimble Deposition at p. 154, Docket Entry No. 678–6 at p. 678–6 at p. 14)

Because the undisputed evidence establishes that in 1994 when Deloitte conducted the rate-setting work at issue in this case, there was no "specific and defined" methodology for setting SHARS rates, and

because Relator has failed to present evidence from which a jury could reasonably conclude that Deloitte violated any regulatory requirements (see § III.C. above), neither the regulatory violations that Relator alleges Deloitte committed nor Deloitte's failure to respond differently to the concerns that Relator raised in 1994 as part of his job with the TDH or now as the Relator in this action, give rise to an inference that Deloitte deliberately ignored or recklessly disregarded the truth or falsity of the recommended rates. *See Southland*, 326 F.3d at 682 (Jones, J. concurring) ("Where disputed legal issues arise from vague provisions or regulations," a contractor's reasonable interpretation of the vague regulation "cannot result in his filing a 'knowingly' false claim.").

**(2) No Evidence of Knowledge Based on Deloitte's Profit Motive**

Relator asserts that "[a]nother factor important to any consideration of a party's state of mind is the issue of motive." (Docket Entry No. 729–2 at p. 4) Relator argues that because Deloitte represented a number of school districts on a contingency fee basis that Deloitte was motivated to inflate its recommended rates because "the higher the statewide rates, the more money Deloitte makes from its school district clients." (Docket Entry No. 729–2 at p. 4) Relator argues that Deloitte's November 10, 1992, Fort Worth ISD Draft Work Plan and Revenue Estimates (Exhibit 3b, Docket Entry No. 729–29 at pp. 1–30) raises an inference of fraud because in it Deloitte "went so far as to analyze the profit impact a successful increase in the rates would have on its school district business as well as covering its own internal costs of performing the work for the State." (Docket Entry No. 729–2 at p. 4) Because Deloitte's analysis estimated that its work for the State would cost approximately $231,000, but that its cost-benefit

analysis indicated that the expenditure was justified by the increased revenues to be expected from increased SHARS rates, Relator infers that Deloitte was motivated to manipulate the rates to increase the profit from its school district clients. Relator's profit motive analysis is necessarily premised on an inference that the SHARS rates could only be increased by fraudulent manipulation of the data or the methodology, an inference that is not supported by any of the relevant evidence.

Prior to the rate-setting work that is the subject of this lawsuit, SHARS reimbursement rates were based on cost data from approximately 14 school districts that had participated in a 1989 cost study conducted by the Texas Interagency Council on Early Childhood Intervention. (See Staff Performance Report to 74th Legislature, Docket Entry No. 678–7 at p. 48.) Because these rates were based on cost data gathered in 1989, even Relator himself recognized that they were too low. Relator testified at his deposition that a plan was in place to change the SHARS rates before March 21, 1994, when Deloitte sent its letter offering technical assistance to the TDH, and that because the then-existing rates were based on old data they were not reflective of what was being expended at that time. (Gudur Deposition at pp. 291–292, Docket Entry No. 678–5 at p. 16) Relator also testified that his own attempt to set SHARS rates yielded rates that were higher than the then-existing rates:

Q. So, in fact, the plan was in place to replace the current SHARS rates before March of 1994; is that true?

A. I'm saying that there is no such thing like a plan. I'm just saying that I was instructed that I needed to develop new rates to replace the old ones.

Q. Because the old ones were not sufficient to cover the costs of services.

A. The old ones were based on data from a few years back, so they were not, you know, timely and correct, you know. Probably not reflective of what was being expended at that time.

Q. So you agree with Deloitte in this letter when it says that the—the rates, existing rates, are—were currently too low as of March of 1994. You agreed with them at that time; didn't you?

A. No. No. I didn't have an opinion one way or the other.

Q. Well, but your—You had developed rates that were, in fact, higher than the old rates; is that correct?

A. Yes. The analysis came up with the higher rates and that is the way it was.

. . .

Q. Was it your opinion in March of 1994 that the existing rates used in the SHARS Program did not adequately reflect the cost of the services and in fact were too low?

A. That is what Mr. Ken Crow told us and that is what I thought was probably true.

Q. So the answer is "Yes"?

A. Yes, based on what Mr. Ken Crow told me.

. . .

Q. And your analysis suggested that those rates were too low; isn't that correct?

A. The results that I got from my analysis, of course, led to higher rates, yes, compared—

Q. So your belief was—And you believed in your analysis, right? You believed it was accurate, I assume.

A. As best as I could.

Q. And so your—what you believed to be an accurate rebasing of the Early Childhood rates resulted in higher rates; correct?

A. Yes.

(Gudur Deposition at pp. 292–295, Docket Entry No. 678–5 at pp. 16–17)

Because Relator's own testimony demonstrates the existence of a valid basis for increasing the SHARS rates, and because Relator has failed to present any evidence from which a reasonable jury could conclude that Deloitte relied on an invalid basis in formulating the rate increases that it recommended, the court is not persuaded that there is any evidence of Deloitte's profit motive from which a jury could infer that Deloitte possessed any level of knowledge required to impose FCA liability. Moreover, even if Deloitte had a profit motive for increasing the SHARS rates, evidence of profit motive alone is insufficient to demonstrate FCA liability. *See Medica–Rents*, 285 F.Supp.2d at 772. For both of these reasons the court rejects this argument.[9]

### (3) Deloitte's Disclosures to State of Texas

Deloitte argues that the disclosure of its methodology and its reliance on the cooperation and collaboration of state officials to establish that methodology negate any inference that Deloitte acted with reckless disregard. Deloitte argues that disclosure of its rate-setting methodology to the State is relevant, not because State knowledge of a misrepresentation would shield it from liability, but because evidence of disclosure points away from any conclusion that Deloitte knowingly made any misrepresentations. *See Southland*, 326 F.3d at 681–682 (Jones, J., concurring) (acknowledging that the federal government's knowledge of the facts underlying an allegedly false statement can negate the scienter required for an FCA violation). In other words, Deloitte argues that its disclosure of its rate-setting practices establishes conclusively that it did not "knowingly" submit false claims or cause false claims to be submitted because "[i]f the government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim." *Id.* at 682 (citing *Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 (7th Cir. 1999)).

Deloitte has presented uncontradicted evidence that the rate-setting effort was, from the beginning, a collaborative effort between Deloitte, TEA, and TDH. In its letter to TDH offering technical assistance, Deloitte outlined the manner in which it intended to formulate its recommended rates and the reasons why it intended to proceed as outlined. (See March 21, 1994, letter from Bankard to Branton, Docket Entry No. 678–8 at pp. 2–5.) Kimble, one of the state's experienced rate-setters, testified that the state was aware of the ap-

---

9. Nor is the court persuaded that Relator has raised an inference of fraudulent intent by asserting that

> Deloitte's fraudulent activities have now been confirmed by at least seven OIG (Office of Inspector General) audits and one GAO (General Accounting Office) report, all of which have concluded that Deloitte's revenue maximization group caused the federal government to incur improper and unallowable costs ... [and that] each audit concluded that Deloitte had engaged in in-

appropriate conduct and had violated numerous governmental regulations, including federal Medicaid provisions and State Medicaid Plan requirements.

(Docket Entry No. 729–2 at pp. 6–7, referencing Exhibit 19e attached thereto) Conspicuously absent from Relator's assertion is any cite to a specific finding within the one audit submitted as an exhibit to his motion, or any evidence that the cited audit is admissible as an exhibit in this action.

proach that Deloitte intended to use, including the fact that Deloitte intended to use a time survey. (See Kimble Deposition at p. 174, Docket Entry No. 678–6 at p. 17.) Deloitte's Christenson testified that he met frequently with state representatives, including TEA's Spurgin and Crow, and TDH's Relator, both to update them on the progress of Deloitte's work and to seek their input. (Christenson Deposition at pp. 206–221, Docket Entry No. 678–4 at pp. 17–20) Christenson testified that together with Spurgin, he reviewed data used to support the rate recommendations and contacted school districts to follow up on the survey response. (Christenson Deposition at p. 63, Docket Entry No. 678–4 at p. 10) When Deloitte completed its work it presented its recommended rates to the State in a 772–page Rate Documentation Package that explained the rate-setting process and contained all of the documentation and underlying data that supported the rate recommendations.

Because Relator cannot point to any document or information that Deloitte failed to disclose to the State, Relator suggests that Deloitte's disclosure of so much information raises an inference of intent to conceal evidence of regulatory violations since Deloitte knew that the State lacked the resources needed to review and evaluate the disclosures. (See Docket Entry No. 729–2 at p. 2.) However, Relator's suggestion is contradicted by the April 7, 1994, letter in which TDH accepted Deloitte's offer of technical assistance and directed Deloitte to "provide copies of any all documentation used in arriving at your results." (Docket Entry No. 678–8 at p. 7) Moreover, Deloitte has presented uncontradicted testimony of Phelps that it provided all the paperwork necessary for TDH to conduct a complete and independent review of the recommendations, that the review was a transparent one, and that the completeness of the documentation was responsive to TDH's directive to De-

loitte contained in the April 7, 1994, letter. (See Phelps Deposition at pp. 80–81 and 227, Docket Entry No. 678–7 at pp. 12 and 24.) Phelps also testified that he had no reason to believe that Deloitte manipulated data to artificially inflate the SHARS rates. (Phelps Deposition at p. 238, Docket Entry No. 678–7 at p. 26)

Because undisputed evidence demonstrates that Deloitte disclosed to the State all of the supporting documentation for its recommended rates in response to a directive from the State, because Relator has failed to present any evidence that Deloitte concealed any material knowledge or information from the State, and because the court is not persuaded that Relator has presented any other evidence, whether considered separately or cumulatively, from which a reasonable jury could conclude that Deloitte either knew, deliberately ignored, or was recklessly indifferent to the truth or falsity of its recommended SHARS rates, the court concludes that Relator has failed to raise a triable issue regarding Deloitte's knowledge.

### 2. Count Two: Conspiracy

Relator's Third Amended Complaint alleges that Deloitte

and the enumerated School District Defendants, including the Client School Districts, the Cost Study Defendants, and the Time Study Defendants, by and through their officers, agents, supervisors, and employees, knowingly conspired to get false or fraudulent claims paid or approved by the United States Government under Medicaid, all as alleged above, and specifically with regard to the SHARS reimbursement rate.

(Docket Entry No. 397–2 at p. 12)

Deloitte argues that the record is devoid of evidence that Deloitte conspired with any school district to unlawfully or artificially inflate the rates for SHARS services. Apart from Relator's unsubstantiated alle-

gations, every witness deposed in this case has testified that no such conspiracy existed. Relator initially named hundreds of school districts as Deloitte's alleged co-conspirators, but his conspiracy claims against those "enumerated" school districts have all since been dismissed. (See Relator's May 8, 2006, Unopposed Motion for Partial Dismissal, Docket Entry No. 670 at p. 2) (requesting dismissal after Relator's review of "voluminous documentation"). Relator's expert witness testified "I did not have any information ... that would make me believe there was a conspiracy with Deloitte & Touche and the school districts." (Figliozzi Deposition at p. 766, Docket Entry No. 678–4 at p. 46)

In response to Deloitte's motion for summary judgment, Relator argues that

> [t]he evidence ... proves that the State's own Ken Crow was working directly with Deloitte to convince the State—which had inadequate resources—to adopt the fraudulent Deloitte rates ... Most importantly, the assistance of the TEA's Ken Crow provides direct proof that the State conspired with Deloitte to fraudulently increase the rates.

(Docket Entry No. 729–2 at p. 9) As argued by Deloitte

> the original scope of Relator's conspiracy claim was whether Deloitte conspired with *Texas school districts* to inflate the SHARS rates in 1994–1995 by manipulating cost or time studies. Faced with overwhelming evidence disproving any such conspiracy, Relator's Response virtually concedes away that conspiracy claim and instead raises another. That effort should be rejected.

(Docket Entry No. 736–1 at p. 26)

. Because Relator did not plead the existence of a conspiracy between Deloitte and either Ken Crow or the State of Texas in his Third Amended Complaint, Relator may not rely on this new claim, raised only in response to Deloitte's motion for summary judgment, to defeat that motion. *See Bass v. Hendrix*, 931 F.Supp. 523, 538 (S.D.Tex.1996). Relator's inability to identify any persons at any school district with whom Deloitte allegedly conspired, or to present any evidence of an agreement between Deloitte and one or more persons at any school district to defraud the federal government by getting a false or fraudulent claim allowed or paid, is fatal to his conspiracy claim. *See Wilkins*, 173 F.Supp.2d at 639 & n. 33.

### 3. *Conclusions*

For the reasons explained above the court concludes that Relator's summary judgment evidence fails to raise a triable issue of fact on his claims that Deloitte violated the FCA and, instead, demonstrates only Relator's disagreement with certain aspects of the methodology Deloitte used to formulate the SHARS rates that it recommended to the TDH in 1994.

### IV. *Conclusions and Order*

For the reasons explained above, defendant Deloitte Consulting LLP's Motion to Strike the Statement of Interest of the United States Regarding Deloitte's Motion for Summary Judgment (Docket Entry No. 789) is **GRANTED**. Relator's Motion for Partial Summary Judgment (*Time Survey v. Time Study* ) (Docket Entry No. 679) is **DENIED**. Relator's Motion for Partial Summary Judgment (Indirect Cost) (Docket Entry No. 680) is **DENIED**. Defendant Deloitte Consulting LLP's Motion for Summary Judgment (Docket Entry No. 678) is **GRANTED**.[10]

---

10. The court has allowed the parties extraordinary leeway in submitting numerous briefs

and other written materials in connection with the pending motions. As the length of this Memorandum Opinion and Order indicates, the court has expended considerable time reading these papers and performing a significant amount of independent research to be as fully informed as possible when addressing the parties' arguments. While, because of the sheer volume of information presented, it is possible that some arguments were overlooked, the parties should assume that failure to expressly address a particular argument in this Memorandum Opinion and Order reflects the court's judgment that the argument lacked sufficient merit to warrant discussion. Accordingly, the court strongly discourages the parties from seeking reconsideration based on arguments they have previously raised or that they could have raised.